2006-NMSC-001

126 P.3d 516

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Robert FRY, Defendant–Appellant.**

No. 27,592.

Supreme Court of New Mexico.

Dec. 8, 2005.

John Bigelow, Chief Public Defender, William A. O'Connell, Assistant Appellate Defender, Nancy M. Hewitt, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

Patricia A. Madrid, Attorney General, Steven S. Suttle, Assistant Attorney General, Santa Fe, NM, for Appellee.

## OPINION

SERNA, Justice.

{1} A jury found Defendant Robert Fry guilty of first degree murder, *see* NMSA 1978, § 30–2–1 (1994), kidnapping, *see* NMSA 1978, § 30–4–1 (1995, prior to 2003 amendment), attempted criminal sexual penetration, *see* NMSA 1978, §§ 30–9–11 (1995, prior to 2001 & 2003 amendments), –28–1 (1963), and tampering with evidence, *see* NMSA 1978, § 30–22–5 (1963, prior to 2003 amendment), in relation to a killing in Farmington, New Mexico. The jury then specified a sentence of death, and the trial court sentenced Defendant to death. *See* NMSA 1978, §§ 31–18–14(A) (1993) ("When a defendant has been convicted of a capital felony, he [or she] shall be punished by life imprisonment or death."), –20A–3 (1979) ("In a jury sentencing proceeding in which the jury unanimously finds beyond a reasonable doubt and specifies at least one of the aggravating

circumstances enumerated in [NMSA 1978, § 31–20A–5 (1981)] ..., and unanimously specifies the sentence of death ..., the court shall sentence the defendant to death."). Defendant appeals his conviction and sentence to this Court on numerous grounds. *See* N.M. Const. art. VI, § 2 ("Appeals from a judgment of the district court imposing a sentence of death or life imprisonment shall be taken directly to the supreme court."); NMSA 1978, § 31–20A–4(A) (1979) ("The judgment of conviction and sentence of death shall be automatically reviewed by the supreme court of the state of New Mexico."). We affirm.

## I. FACTS

{2} Defendant and his companion, Leslie Engh, went to a bar in Farmington. After the bar closed, they met friends at a nearby restaurant. Defendant initiated an argument with another customer, and he subsequently went to his car and returned wearing a jacket. Witnesses described seeing a bulge underneath Defendant's jacket. He told one of his friends that he had an eight-inch Bowie knife and he was "going to stick somebody tonight." Defendant and Engh left the restaurant in Defendant's car and went to a convenience store for cigarettes.

{3} Defendant saw a woman, the victim,[1] at a pay phone. The woman was crying and stranded at the store. Defendant offered her a ride to her house in Shiprock. A clerk at the convenience store heard a man fitting Defendant's description offer a ride to a woman fitting the victim's description and also placed Engh in Defendant's car as it drove away with three people inside. Defendant drove down an isolated dirt road under the pretext that he needed to urinate. The victim got out of the car and began to walk away. Defendant convinced the victim to return to the car.

{4} After driving the car a short distance back down the dirt road, Defendant stopped the car, opened the passenger door, and pulled the victim out of the car by her hair. Defendant told Engh to hold the victim's legs while Defendant tried to disrobe her. When the victim struggled, Defendant stabbed her two inches deep in her chest with his eight-inch Bowie knife. The stab wound penetrated the breastbone and the heart sac but did not pierce the victim's heart. The victim removed the knife from her chest and threw it toward a ravine. She tried to run away, but Defendant and Engh caught her and removed her shirt and pants. Engh then went to look for the knife. When the victim tried to run again, Defendant retrieved a ten-pound sledgehammer from his car and hit the victim in the back of the head with the sledgehammer at least three and possibly five times, killing her. Blunt force trauma was the cause of death, and the stab wound was a contributing factor. Defendant and Engh then dragged the victim's body a significant distance to some bushes by the ravine. They also kicked articles of the victim's clothes off the road. As Defendant drove away, his car got stuck in soft sand on the dirt road and had to be towed out the next day. Defendant's parents picked up Defendant and Engh and drove them home.

{5} Police found the knife and the sledgehammer at the scene, along with tire tracks and shoe impressions. A witness recognized the knife at the scene as one that he had sharpened for Defendant a week before the killing. The tire tracks from the scene included three different treads and were determined to be consistent with the three different tire treads on Defendant's car. Police found a pair of boots in Defendant's home that was consistent with the shoe impressions at the scene. Police also found a black t-shirt in Defendant's home that matched the shirt witnesses described Defendant as having worn on the night of the killing, and they found one of the victim's earrings in Defendant's car. The boots and black t-shirt from Defendant's home had blood on them, and police also found blood in Defendant's car and on a flashlight in the car that Defendant had used to signal his parents after getting stuck. An expert testified that the blood on the knife and sledgehammer and on Defendant's car, shirt, shoes, and flashlight all matched DNA samples from the victim. In addition, the police seized a pair of black

---

1. We do not refer to the victim by name out of respect for her dignity and privacy. *See State v.* *Allen,* 2000–NMSC–002, ¶ 2 n. 1, 128 N.M. 482, 994 P.2d 728.

tennis shoes belonging to Engh, and the blood on those shoes also matched the victim's DNA. An expert testified that a blood spatter analysis of Defendant's shirt and shoes and Engh's shoes indicated that while many of the blood stains on Defendant's shirt and shoes were created by medium velocity impact spatter from a blunt instrument striking a blood source in front of the person wearing the shirt and shoes, Engh's shoes contained only low velocity transfer stains and no spatters or projection-type stains. Based on these blood stains, as well as spatter stains on the sledgehammer, the expert opined that the person wearing the clothing with spatter, that is, Defendant's black t-shirt and shoes, was leaning over the victim and repeatedly striking a source of blood with the sledgehammer, whereas the person wearing the shoes without spatter did not strike the victim with the sledgehammer. On the day after the murder, Defendant lied to the police about his activities the previous evening and what clothing he had been wearing, and he concealed his involvement in the crime.

{6} The State charged Defendant with first degree murder, kidnapping, attempted criminal sexual penetration, and tampering with evidence. Engh pleaded guilty to first degree murder and kidnapping and testified against Defendant at trial. The jury found Defendant guilty of all counts. Following further argument of counsel and additional instruction by the trial court, the jury then found the only submitted aggravating circumstance, murder committed with an intent to kill in the commission of kidnapping, beyond a reasonable doubt. After Defendant presented evidence of mitigating circumstances, and following additional instruction by the trial court, the jury specified a sentence of death.

## II. EXCUSAL OF PROSPECTIVE JURORS

{7} Defendant first argues that the trial court erred in excusing seven members of the venire for cause based on their religious opposition to the death penalty. He contends that the exclusion of these prospective jury members violated his constitutional right to an impartial jury, U.S. Const. amends. VI, XIV; N.M. Const. art. II, §§ 14 (amended 1994), 18 (amended 1972), and the veniremembers' state and federal constitutional protection of the free exercise of religion, U.S. Const. amends. I, XIV. *See State v. Singleton,* 2001–NMCA–054, ¶ 9, 130 N.M. 583, 28 P.3d 1124 ("[B]oth the state and the defendant in a criminal action can protect the rights of prospective jurors to be free from discriminatory exclusion."). Defendant relies on Article VII, Section 3 of the New Mexico Constitution, which provides that the right of citizens to sit on a jury shall not be hindered on the basis of religion, as well as various other protections of religious freedom in the state Constitution. Defendant also relies on the Treaty of Guadalupe Hidalgo. *See* Treaty of Peace, Friendship, Limits and Settlement, art. IX, Feb. 2, 1848, U.S.-Mex., 9 Stat. 922, 930.[2]

{8} The United States Supreme Court has held that "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would prevent or substantially impair the performance of his [or her] duties as a juror in accordance with his [or her] instructions and his [or her] oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (quotation marks omitted); *see Witherspoon v. Illinois,* 391 U.S. 510, 522 n. 21, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Under this standard, "[a] juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him [or her] to do." *Morgan v. Illinois,* 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492

2. While we agree with the State that Defendant failed to preserve an argument based on the Treaty, we note that the Treaty does not contain any independent protection of religious freedom beyond the federal and state constitutions. Article IX of the Treaty, upon which Defendant relies and which protects the free exercise of religion

"in the mean time," was designed only to address the interim period between the ratification of the Treaty and "the enjoyment of all the rights of citizens of the United States" once individuals were admitted as citizens following the one year allowed in Article VIII, 9 Stat. 922, for the election of citizenship.

(1992). "[B]ecause such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror[, and] a capital defendant may challenge for cause any prospective juror who maintains such views." *Id.* Similarly, "a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and *must* be removed for cause." *Id.* at 728, 112 S.Ct. 2222 (emphasis added). Such jurors are sometimes referred to as *Witherspoon*-excludables. "[T]he quest is for jurors who will conscientiously apply the law and find the facts." *Witt,* 469 U.S. at 423, 105 S.Ct. 844.

{9} We have on numerous occasions applied this standard in addressing challenges to the exclusion of jurors who expressed religious opposition to the death penalty, whether the challenges were based on the defendant's right to an impartial jury, due process, or equal protection, or on prospective jurors' religious freedom as protected in Article VII, Section 3 and other provisions of the New Mexico Constitution. *Allen,* 2000–NMSC–002, ¶¶ 85–86, 128 N.M. 482, 994 P.2d 728; *State v. Clark,* 1999–NMSC–035, ¶¶ 4–17, 128 N.M. 119, 990 P.2d 793; *State v. Sutphin,* 107 N.M. 126, 129–30, 753 P.2d 1314, 1317–18 (1988); *State v. Gilbert,* 100 N.M. 392, 396, 671 P.2d 640, 644 (1983); *State v. Simonson,* 100 N.M. 297, 299–300, 669 P.2d 1092, 1094–95 (1983); *State v. Hutchinson,* 99 N.M. 616, 619–20, 661 P.2d 1315, 1318–19 (1983); *State v. Trujillo,* 99 N.M. 251, 252, 657 P.2d 107, 108 (1982); *State v. Trivitt,* 89 N.M. 162, 164–66, 548 P.2d 442, 444–46 (1976). We held that "[t]he trial court may properly exclude a juror for cause if the juror's views would substantially impair the performance of the juror's duties in accordance with the instructions and oath." *Clark,* 1999–NMSC–035, ¶ 10, 128 N.M. 119, 990 P.2d 793. We explained that "[t]he fact that the potential juror's inability to perform his or her duty is based upon religious objection and belief does not violate the religious protections of the New Mexico Constitution, because exclusion from the jury was not based upon religious affiliation." *Id.* ¶ 17. "[R]ather than

the court excluding jurors because they are members of a particular religion, the court excluded jurors who were unable to apply the law." *Id.* ¶ 12. "For purposes of disqualifying an individual from serving on a jury in a death penalty case, it is the fact that the individual's vote will be automatic, rather than the particular reasons he or she gives for casting such an automatic vote, that is dispositive." *Allen,* 2000–NMSC–002, ¶ 86, 128 N.M. 482, 994 P.2d 728.

{10} We have also discussed the appropriate standard of review in response to challenges of this nature. "This Court has stated that the trial court is in the best position to assess a juror's state of mind, by taking into consideration the juror's demeanor and credibility. It is within the trial court's discretion as to whether a prospective juror should be excused." *Clark,* 1999–NMSC–035, ¶ 10, 128 N.M. 119, 990 P.2d 793. "We will not disturb the trial court's decision absent a clear abuse of discretion or a manifest error." *Sutphin,* 107 N.M. at 130, 753 P.2d at 1318.

{11} Defendant does not challenge the trial court's discretionary ruling that all seven members of the venire highlighted on appeal were unable to impose the death penalty in any case so as to substantially interfere with their ability to perform the duties of a juror in accordance with the instructions and oath. Following our review of the record, we agree with this concession and conclude that the trial court did not abuse its discretion in determining that these prospective jurors satisfied the *Witt* standard and were properly excluded for cause. The record indicates that the trial court was appropriately focused throughout jury selection on the ability of veniremembers to follow the court's instructions. Instead, Defendant complains about the exclusion of these prospective jurors from the guilt-innocence phase of the trial. Defendant contends that these seven jurors should have been permitted to sit on the jury during the guilt-innocence phase of the trial and then, following a verdict, be excused and replaced by alternate jurors for the sentencing phase. He contends that such a procedure is authorized by

Rule 5–704(A) NMRA 2004 (prior to Apr. 19, 2004 amendment) (current version at Rule 5–704(E) NMRA 2005). This rule provides that

> [i]f the defendant is charged with an offense which may be punished upon conviction by the penalty of death, alternate jurors shall not be discharged until the regular jurors are discharged. Such jurors may not attend or participate in the consideration of a verdict, but shall be treated in the same manner as other jurors and shall be called after a verdict is returned to act as alternate jurors to replace jurors who become or are found to be unable or disqualified to consider the sentence to be imposed.

Defendant argues that we should interpret this rule to allow for "extra non-*Witherspoon*-excludable jurors" to serve as alternates for members of the venire who would automatically vote against the death penalty in order to protect the right of citizens to serve on juries as protected by Article VII, Section 3. We reject this argument.

{12} We believe that Defendant misinterprets Rule 5–704(A). We did not promulgate this rule in order to permit members of the venire to participate in the guilt-innocence phase of the trial despite their inability to follow the juror's oath to impose a sentence "according to the evidence and the law as contained in the instructions of the court." UJI 14–123 NMRA 2005. Instead, we enacted this rule pursuant to the Legislature's direction to this Court to "promulgate rules . . . to regulate the practice and procedure in capital felony cases for the selection and utilization of alternate jurors and substitute trial judges caused by the disability of any juror or trial judge before whom a capital felony sentencing proceeding has commenced pursuant to the" Capital Felony Sentencing Act, NMSA 1978, §§ 31–20A–1 to –6 (1979, as amended through 1991). 1979 N.M. Laws, ch. 150, § 11. In other words, Rule 5–704(A) is designed to effectuate the provisions of the Capital Felony Sentencing Act, and the Legislature expressly provided in the Act that, "[i]n a jury trial, the sentencing proceeding shall be conducted as soon as practicable by the original trial judge before the *original trial jury.*" NMSA 1978, § 31–20A–1(B) (1979) (emphasis added). It is clear from this language that the Legislature intended for the original jurors, that is, those jurors who determine a defendant's guilt or innocence, to determine the sentence. The Legislature's provision for alternate jurors was designed only as a necessary contingency in the event that a juror's disqualification or inability to serve becomes apparent after having been seated, and particularly after the jury reaches a verdict in the guilt-innocence phase, in order to avoid a second trial due to a juror's excusal. It is not a method of permitting individuals to serve on one part of a trial who, prior to the empaneling of the jury, have expressed a bias and an inability to follow the law with respect to another part of the trial. To conclude otherwise would judicially create a two-jury procedure that would frustrate the Legislature's policy decision that the "original jury" specify the sentence. *See Torres v. State*, 119 N.M. 609, 612, 894 P.2d 386, 389 (1995) ("[I]t is the particular domain of the legislature, as the voice of the people, to make public policy.").

{13} Our Legislature is not alone in this policy choice. Courts have noted a number of reasons why legislatures have chosen to rely on a single jury to determine both guilt or innocence and the proper sentence in a capital case: (1) the questions before the jury at both phases are interwoven and require consideration of similar evidence, *Rector v. State*, 280 Ark. 385, 659 S.W.2d 168, 173 (1983) ("[T]he possibility of a compromise in the jury room links the two issues inseparably together."); (2) the jury hearing the guilt-innocence phase may harbor residual doubts about the defendant's guilt, despite having been persuaded of guilt beyond a reasonable doubt, and may take those residual doubts into account in sentencing, *Lockhart v. McCree*, 476 U.S. 162, 181, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); and (3) the use of repetitive trials for the benefit of two juries is not likely to be fair to either party, *id.; Rector*, 659 S.W.2d at 173. The third of these reasons would not apply to Defendant's proposed procedure of seating additional alternate jurors, because alternates would observe the guilt phase, but the first two reasons would still apply because alternates

"may not attend or participate in the consideration of a verdict." Rule 5–704(A). In *McCree*, the Supreme Court overturned an Eighth Circuit opinion that, similar to Defendant's argument, suggested the alternative of "selecting enough alternate jurors at the outset to replace [*Witherspoon*-excludables] at the penalty phase." *Grigsby v. Mabry*, 758 F.2d 226, 243 (8th Cir.1985), *rev'd sub nom. McCree*, 476 U.S. at 184, 106 S.Ct. 1758. The dissent in the Eight Circuit noted that

> [p]lacing the moral responsibility on the same group of jurors to decide both guilt and punishment is justified by the most significant policy considerations. When one jury hears both phases of the case, the jurors that comprise it cannot evade the heavy responsibility placed upon them of whether a convicted person should receive the death penalty. The court today would seem to require the replacement of some members of the guilt-phase jury with death-qualified jurors for the purpose of considering the death penalty. This division of responsibility between the two groups, even if only a few are replaced, would dilute accountability and disadvantage the accused.

*Grigsby*, 758 F.2d at 247 (Gibson, J., dissenting). For these reasons, "the removal for cause of '*Witherspoon*-excludables' serves the State's entirely proper interest in obtaining *a single jury* that could impartially decide all of the issues in [the defendant's] case." *McCree*, 476 U.S. at 180, 106 S.Ct. 1758 (emphasis added). *See generally People v. Johnson*, 3 Cal.4th 1183, 14 Cal.Rptr.2d 702, 842 P.2d 1, 14 (Cal.1992) (rejecting a similar proposal for using alternate jurors as an alternative to death qualification).

{14} Our interpretation of Rule 5–704(A) is supported by other rules relating to alternate jurors and death penalty procedures. For example, Rule 5–605(B) NMRA 2005 provides that "[i]n any criminal case, the district court may direct that not more than six jurors, in addition to the regular jury, be called and impaneled to sit as alternate jurors." Under Defendant's proposed procedure, there is no provision for seating more than six alternates in order to have "extra non-*Witherspoon* excludable jurors" if, as in this case, there are more than six *Witherspoon*-excludables. *Cf. Hutchinson*, 99 N.M. at 620, 661 P.2d at 1319 (stating that death qualification of jurors pre-trial "is the only reasonable manner in which voir dire can be conducted [because,] [o]therwise, there is no way of knowing how many jurors should be impaneled"). In addition, Rule 5–606(C) NMRA 2005 provides that the trial court "may excuse any juror for good cause" and does not contemplate the excusal of prospective jurors for only one part of a trial if they have an inability to follow the court's instructions on a limited issue. Finally, UJI 14–121 NMRA 2005, which sets out appropriate voir dire questions in death penalty cases, states that "[t]he same jury is used for both phases" of a capital trial. In short, our rules, including Rule 5–704(A), reflect the Legislature's decision to have a single jury, composed of the same jurors, decide both the question of guilt or innocence and the appropriate sentence in a death penalty case.

{15} Defendant contends that the process of death qualification results in a jury that is conviction-prone, and he argues that the procedure he outlines would cure this problem. We are not persuaded. Defendant contends that Rule 5–704(A) permits individuals to be seated on the jury despite expressing an automatic vote with regard to the sentence. However, under this formulation of the rule, those members of the venire who express an automatic vote for the death sentence would also be eligible to participate in the guilt-innocence phase of the trial.[3] We

---

**3.** Although Defendant frames the argument only in terms of members of the venire who express a religious opposition to the death penalty, there would be no basis within Rule 5–704(A) to distinguish such jurors from those who would automatically vote for the death penalty in terms of the prospective jurors' ability to follow the instructions of the court during the guilt-innocence phase. We also note that the seven prospective jurors highlighted by Defendant were not the only individuals to rely on religious beliefs; some prospective jurors expressed an automatic vote for the death penalty based on the tenet of an-eye-for-an-eye, while other veniremembers described an ambivalence that resulted from the theological teaching of an-eye-for-an-eye in the Old Testament being in conflict with the teachings of the New Testament. Moreover, consider-

believe it is significant that, in comparison to the seven veniremembers highlighted by Defendant, the trial court excused at least nineteen members of the venire who stated that they would automatically vote for the death penalty for all first degree murders accompanied by at least one aggravating circumstance. Thus, it would appear that in Defendant's case the *Witt* procedure of removing jurors who would automatically vote against the death penalty was offset by the *Witherspoon/Morgan* procedure for removing jurors who would automatically favor the death penalty. While "a state may not entrust the determination of whether a [person] should live or die to a tribunal organized to return a verdict of death," *Witherspoon*, 391 U.S. at 521, 88 S.Ct. 1770, it is also true that a defendant is not "entitled to a legal presumption or standard that allows jurors to be seated who quite likely will be biased in his [or her] favor" "simply because [the] defendant is being tried for a capital crime." *Witt*, 469 U.S. at 423, 105 S.Ct. 844. As the Supreme Court has stated, death qualified juries "represent[ ] a necessary balancing of the accused defendant's right to a jury panel drawn from a 'fair cross section of the community' . . . against the traditional right of a party to challenge a juror for bias." *Witt*, 469 U.S. at 424 n. 5, 105 S.Ct. 844. Prospective jurors are excluded "in order to promote [the State's] interest in having a jury that could properly find the facts and apply the law at both the guilt and sentencing phases of the . . . trial." *Buchanan v. Kentucky*, 483 U.S. 402, 415, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987). As shown by the exclusion of prospective jurors in this case with extreme views at both ends of the spectrum, we believe that the *Witt/Witherspoon* standard strikes the proper balance and assures a jury composed of individuals capable of applying the law to the facts and following the instructions of the court, without being predisposed in favor of either party. *Cf. Morgan*, 504 U.S. at 735, 112 S.Ct. 2222 ("[T]he belief that death should be imposed *ipso facto* upon

conviction of a capital offense reflects directly on that individual's inability to follow the law. Any juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of law.") (citation omitted). "[T]he Constitution presupposes that a jury selected from a fair cross section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their .sworn duty to apply the law to the facts of the particular case." *McCree*, 476 U.S. at 184, 106 S.Ct. 1758.

{16} Additionally, we note that several members of the venire who expressed either an opposition to the death penalty or an automatic vote in favor of the death penalty, including one of the prospective jurors highlighted by Defendant on appeal, indicated that their views on sentencing would also affect their ability to be fair in the determination of guilt or innocence. Considering that *Witherspoon*-excludables possess such strong views on the death penalty that they "cannot and will not conscientiously obey the law with respect to one of the issues in a capital case," *McCree*, 476 U.S. at 176, 106 S.Ct. 1758, our Legislature, in setting out a single jury system, might have concluded that such prospective jurors could not reasonably be expected to set aside their beliefs about the death penalty during the guilt-innocence phase knowing that the sentence they vehemently oppose could, based on their vote, be considered by other jurors. *See Rector*, 659 S.W.2d at 174 ("[W]hat is to prevent a juror strongly opposed to capital punishment, in an effort to avoid feeling *any* responsibility for a death sentence, from choosing to hang the guilt-innocence jury by a vote for acquittal?"). Certainly, given our current statutory scheme and precedent, the parties did not have a meaningful opportunity to explore this issue with all of the veniremembers excluded for cause. In fact, in rejecting an argument that *Witherspoon*-ex-

ing that prospective jurors expressing an automatic vote with respect to sentencing, either in favor of the death penalty or opposed to it, would be similarly situated in terms of their ability to follow the law, we could not allow those religiously opposed to the death penalty to sit on the

guilt-innocence phase while excluding other prospective jurors from this phase based on their sentencing views without raising concerns about equal protection or creating an impermissible religiously-based preference. *See N.M. Const.* art. II, §§ 11, 18.

cludables should be allowed to sit on the jury during the guilt-innocence phase, we stated in *Simonson,*

> We are compelled to point out problems that may result by not excusing jurors pursuant to the questioning [set out in the Uniform Jury Instructions] and instead having a very large jury panel hearing all the evidence on the guilt phase only later to be excluded at the sentencing phase. If such a result occurred, [the Uniform Jury Instructions] would have to be changed to ask the jurors if they could convict a defendant knowing that some other person could then impose a penalty of death based upon that conviction. There would also have to be new guidelines adopted to establish the manner in selecting the jurors for the sentencing phase. In addition, the matter of challenges, now set by statute, would have to be changed by court rule. These are only some of the potential problems that would be raised by the procedure [the defendant] suggests. As we have done in previous opinions, we again emphatically and unequivocally reject [this] argument.

100 N.M. at 300, 669 P.2d at 1095.

{17} For the above reasons, we conclude that Rule 5–704(A) does not allow *Witherspoon*-excludables to sit on the guilt-innocence phase of a capital trial and that such a procedure is precluded by Section 31–20A–1(B)'s requirement that sentencing be conducted before the original jury. We reiterate that "[t]he trial court may properly exclude prospective jurors who indicate that they could not vote to impose the death penalty under any circumstances." *Clark,* 1999–NMSC–035, ¶ 7, 128 N.M. 119, 990 P.2d 793.

### III. GENERAL VERDICT FORM FOR FIRST DEGREE MURDER

■ {18} Defendant next argues that the trial court erred in refusing to provide separate verdict forms for two different theories of first degree murder, deliberate intent murder and felony murder. Defendant concedes that separate instructions were not required for a guilty verdict on the crime of first degree murder. This Court has previously held that first degree murder is a single crime, whether supported by a single theory or by multiple theories, and we have upheld a general verdict of first degree murder under two alternative theories on the basis that there is "no requirement that the jurors ... unanimously agree on one of the alternative theories presented" and "[u]nanimity was only required with regard to the overall charge of first degree murder." *State v. Salazar,* 1997–NMSC–044, ¶¶ 41–42, 123 N.M. 778, 945 P.2d 996. We also concluded in *Salazar* that a general verdict of first degree murder did not violate the right to due process in the New Mexico Constitution, relying upon the Supreme Court's analysis in *Schad v. Arizona,* 501 U.S. 624, 641–44, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). *Salazar,* 1997–NMSC–044, ¶ 39, 123 N.M. 778, 945 P.2d 996. However, Defendant contends that this rule should be different for capital sentencing.

{19} Defendant first argues that, without a separate verdict form, it is possible that the jury convicted on a theory of felony murder. Defendant then makes two arguments based on this supposition. First, Defendant contends that felony murder is insufficient to support the death penalty. Defendant contends that "[r]eading New Mexico's murder statute together with the Capital Felony Sentencing Act, in fact, strongly suggests that the New Mexico legislature never intended the crime of felony murder to be death-eligible." Second, Defendant contends that a conviction of felony murder "allows the state to avoid proving every element of the crime" of deliberate intent murder.

{20} Defendant's argument, however, overlooks the plain language of the Legislature. Both felony murder and deliberate intent murder are different theories of a single crime, first degree murder. § 30–2–1(A). The Legislature has explicitly provided that "[w]hoever commits murder in the first degree is guilty of a capital felony." *Id.* The Legislature further expressly provided that "[w]hen a defendant has been convicted of a capital felony, he [or she] shall be punished by life imprisonment or death." § 31–18–14(A). It is the crime of first degree murder, and not any particular theory, that

the Legislature has designated as eligible for capital sentencing when an aggravating circumstance is present. There is no ambiguity in this legislative scheme. Given this plain language, Defendant in fact acknowledges under a separate argument heading that "[f]elony murder is, by statute, a capital crime in New Mexico." Because the Legislature included felony murder as a capital offense, Defendant's missing elements argument is also without merit. When the State proves the elements of felony murder, it has proved all of the elements of the capital felony of first degree murder. There is no requirement that the State also prove the element of deliberate intent for the alternative theory of willful, deliberate, and premeditated murder in order for the jury to render a guilty verdict on the crime of first degree murder on the theory of felony murder.

{21} Defendant, relying on *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) and *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), also contends that allowing the death penalty for felony murder, particularly under an accomplice theory, does not properly narrow the field of potential defendants exposed to capital punishment as required by the United States Supreme Court. Defendant contends that felony murder "holds the felon strictly responsible for the fatal consequences that he may not have foreseen, committed, or even desired." Defendant further argues that

> "[a] defendant may be found guilty of murder ... if he participated in a crime that resulted in the killing of a person" and that "[w]hen a defendant is an accomplice, and the killing is a foreseeable consequence of the underlying crime, it is immaterial to his guilt whether he killed a person, attempted to kill a person, *or even intended or knew that a killing would take place.* As an accomplice, the killer's state of mind is imputed to the defendant. *See generally* UJI 14–2821 NMRA [2005]."

(emphasis added). However, Defendant misunderstands the crime of felony murder under New Mexico law. As stated in the very jury instruction and cases cited by Defendant, New Mexico law requires a greater mens rea showing for both felony murder and accomplice liability.

{22} For felony murder, the State must prove that the defendant either intended to kill or knew that his or her acts created a strong probability of death or great bodily harm. *State v. Ortega,* 112 N.M. 554, 563, 817 P.2d 1196, 1205 (1991). This Court has explained why New Mexico's felony murder statute is unique. "The primary distinction between New Mexico's felony-murder doctrine and those of other jurisdictions is that ... this Court impose[s] a mens rea requirement for felony murder." *State v. Campos,* 1996–NMSC–043, ¶ 16, 122 N.M. 148, 921 P.2d 1266. "New Mexico does not abandon the mens rea requirement for murder, nor does it create a presumption that a defendant had intended to kill whenever a homicide occurs during the course of a felony." *Id.* ¶ 17. "Accordingly, unlike other jurisdictions, New Mexico's modernized felony-murder doctrine does not run the risk of circumventing the legislatively determined mens rea for murder." *Id.* ¶ 18.

{23} For accomplice liability, the State must show not only, as Defendant suggests, aiding in the commission of the killing but also that the defendant intended that the underlying felony be committed and "intended the killing to occur or knew that [he][she] was helping to create a strong probability of death or great bodily harm." UJI 14–2821. New Mexico law therefore requires a significantly higher showing of mens rea for both accomplice liability and felony murder than described by Defendant. Because the United States Supreme Court has held that accomplices to felony murder may be subjected to capital punishment if the defendant actually killed, attempted to kill, intended to kill, knew that death was substantially certain to result, or had a culpable mental state of reckless indifference to life and was a major participant in the killing, *Tison,* 481 U.S. at 150–51, 157–58, 107 S.Ct. 1676, Defendant's argument that accomplice liability for felony murder in New Mexico does not sufficiently narrow the class of defendants subjected to

capital punishment is without merit.[4] Defendant's contention that "[t]he only class that is clearly narrow enough is the class of only those who commit first-degree premeditated murder with an intent to kill" is contrary to clearly established New Mexico and federal law.

{24} In any event, Defendant overlooks the fact that New Mexico also requires an aggravating circumstance, in addition to the commission of felony murder, in order to be eligible for the death penalty. § 31–20A–3 (requiring that "the jury unanimously find[ ] beyond a reasonable doubt and specif[y] at least one of the aggravating circumstances enumerated in Section [31–20A–5]"). More particularly, Defendant overlooks the elements of the aggravating circumstance in this case. The aggravating circumstance of murder in the course of a kidnapping requires an "intent to kill." § 31–20A–5(B). Defendant received a jury instruction during the sentencing phase that included this element. Thus, the jury found that Defendant intended to kill the victim, and the Supreme Court has unequivocally stated that a death sentence for felony murder supported by an intent to kill is not disproportional and does not violate the Eighth Amendment. *Tison*, 481 U.S. at 150, 107 S.Ct. 1676 (stating that

in *Enmund* "[t]he Court clearly held that the equally small minority of jurisdictions that limited the death penalty to [felony murderers who actually killed, attempted to kill, or intended to kill] could continue to exact it in accordance with local law when the circumstances warranted"). In fact, based on Section 31–20A–5's requirement of an aggravating circumstance in addition to the commission of felony murder, and with almost all of the enumerated aggravating circumstances requiring an intent to kill, the Supreme Court has specifically characterized New Mexico as one of only eleven states authorizing capital punishment that "forbid imposition of the death penalty even though the defendant's participation in the felony murder is major and the likelihood of killing is so substantial as to raise an inference of extreme recklessness." *Tison*, 481 U.S. at 154 & n. 10, 107 S.Ct. 1676. Because New Mexico requires an intent to kill, the availability of the death penalty for felony murder in New Mexico is not disproportional and does not apply to an overly broad class of defendants.

{25} It is noteworthy that the case upon which we relied in *Salazar* to uphold a general verdict form, *Schad*, involved the presentation of the same two theories of first degree

4. The State argues that we need not assess the validity of accomplice liability because the uncontroverted testimony supports a jury finding beyond a reasonable doubt that Defendant was the principal in the victim's killing and that, in comparison, there is little to support a finding of complicity by Defendant. In response to this argument, Defendant contends that, absent an indication in the record of the basis for the jury's verdict, we must assume that the jury relied on accomplice liability in order to ensure that this alternative of the crime is legally adequate. Defendant relies on *State v. Foster*, 1999–NMSC–007, ¶ 28, 126 N.M. 646, 974 P.2d 140, in which we addressed whether verdicts on more than one offense violated the multiple punishment prong of double jeopardy. We stated in *Foster* that "the Double Jeopardy Clause does require a conviction under a general verdict to be reversed if one of the alternative bases for conviction provided in the jury instructions is 'legally inadequate' because it violates a defendant's constitutional right to be free from double jeopardy." *Id.* ¶ 27. Defendant's reliance on *Foster*, however, is misplaced. Unlike our double jeopardy inquiry in that case, in which we evaluated the claim by assessing the essential elements found by the jury, the Supreme Court has expressly

held that "the Eighth Amendment does not require that a jury make the findings required by *Enmund*." *Cabana v. Bullock*, 474 U.S. 376, 392, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986), *overruled on other grounds by Pope v. Illinois*, 481 U.S. 497, 503 n. 7, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987). *Enmund* and *Tison* are based on the Eight Amendment's requirement that the death penalty not be excessive or disproportionate, and the Supreme Court recognized that a determination of proportionality "has long been viewed as one that a trial judge or an appellate court is fully competent to make." *Cabana*, 474 U.S. at 386, 106 S.Ct. 689. "[T]he rule [of *Enmund* and *Tison* ] remains a substantive limitation on sentencing, and like other such limits it need not be enforced by the jury." *Id.* Because the Supreme Court does not require that the *Tison/Enmund* finding be made by a jury, we are not bound by the instructions provided to the jury in assessing whether the evidence in this case satisfies the proportionality requirement in the Eighth Amendment. Nevertheless, because we conclude that the jury made the finding required by *Tison*, it is unnecessary for us to look beyond the instructions in this case in answering this argument.

murder at issue in the present case, that is, felony murder and willful, deliberate, and premeditated murder. 501 U.S. at 630, 111 S.Ct. 2491. The defendant in *Schad* was sentenced to death and, similar to Defendant's argument, contended that the federal Constitution required jury unanimity on a particular theory of first degree murder in capital cases even if it did not so require in cases involving lesser penalties. *Id.* For reasons substantially similar to those we articulated in *Salazar,* the Supreme Court rejected this argument. *Id.* at 644–45, 111 S.Ct. 2491. Therefore, for the above reasons, we conclude that our holding in *Salazar* regarding general verdict forms on the crime of first degree murder applies equally in death penalty cases.

## IV. THE AGGRAVATING CIRCUMSTANCE OF KIDNAPPING DURING THE COURSE OF THE MURDER

{26} Defendant raises a number of arguments relating to the aggravating circumstance of kidnapping during the course of a murder. Defendant argues that the felony of kidnapping cannot be used both as the underlying felony for felony murder and as the aggravating circumstance for capital sentencing. He contends that a sentencing scheme that permits the death penalty for "a broad range of felony murderers" creates too broad a class of death-eligible crimes to survive constitutional scrutiny. Defendant relies on *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), in which the Supreme Court stated that "an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *See Gregg v. Georgia,* 428 U.S. 153, 189, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) ("[W]here discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.") (opinion of Stewart, J.). The Supreme Court has also indicated more re-

cently that "the death penalty is reserved for a narrow category of crimes and offenders." *Roper v. Simmons,* 543 U.S. 551, 125 S.Ct. 1183, 1195, 161 L.Ed.2d 1 (2005). "States must give narrow and precise definition to the aggravating factors that can result in a capital sentence." *Id.* at ——, 125 S.Ct. at 1194.

{27} As with his previous argument, Defendant again fails to note the restricted application of felony murder in New Mexico and the substantial narrowing of felony murders eligible for the death penalty achieved by the requirement of one or more of a limited number of aggravating circumstances. In order to establish felony murder, the State must prove the culpable mental state of an intent to kill or knowledge of a substantial certainty of death or great bodily harm. *Campos,* 1996–NMSC–043, ¶ 17, 122 N.M. 148, 921 P.2d 1266 (stating that New Mexico does not employ "a presumption that a defendant had intended to kill whenever a homicide occurs during the course of a felony"). In addition, the State must demonstrate "the commission of a first-degree felony or a lesser-degree felony that is itself inherently dangerous or is committed under circumstances that are inherently dangerous," and the underlying felony cannot be a lesser-included offense of second degree murder. *Id.* ¶¶ 18–19.

{28} Beyond these limitations on the crime itself, not all felony murders are eligible for the death penalty, and not all underlying felonies constitute an aggravating circumstance. In fact, the only underlying felonies for felony murder that can serve as an aggravating circumstance for capital sentencing are kidnapping, criminal sexual contact of a minor, and criminal sexual penetration. § 31–20A–5(B). For the use of each of these three felonies as an aggravating circumstance, the Legislature imposed the additional requirement of demonstrating beyond a reasonable doubt that the defendant had an intent to kill. *Allen,* 2000–NMSC–002, ¶ 74, 128 N.M. 482, 994 P.2d 728 ("Even if the jury has found the defendant guilty of a felony murder in the commission of a kidnapping, it must also find that the murder was committed with an intent to kill in order to find this

aggravating circumstance.") (quotation marks and quoted authority omitted). "[T]he aggravating circumstance of murder in the commission of kidnapping does not follow automatically from a guilty verdict on the underlying offenses of kidnapping and murder." *Id.* ¶ 73. This additional requirement distinguishes the aggravating circumstance from the crime of felony murder, which requires only knowledge of a strong probability of death or great bodily harm. *Compare* UJI 14–7015 NMRA 2005, *with* UJI 14–202 NMRA 2005. Aggravating circumstances

> are *not* elements of capital murder, but are instead intended to explain the kinds of circumstances that our legislature has determined warrant the most severe punishment for capital murder.... Where the legislature believed that intent was an appropriate criteria upon which a death sentence could be based, it included the specific requirement of intent to kill in the given aggravating circumstance.

*State v. Compton,* 104 N.M. 683, 693, 726 P.2d 837, 847 (1986). Because New Mexico requires a separate mens rea showing for felony murder and also requires an even greater mens rea of an intent to kill for the limited number of particularly dangerous felonies that can serve as an aggravating circumstance, the Legislature has genuinely narrowed the class of crimes and defendants eligible for the death penalty consistent with precedent from the Supreme Court. *See Lowenfield v. Phelps,* 484 U.S. 231, 242, 243 & n. 6, 246, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (upholding a sentencing scheme that relied on the commission of aggravated kidnapping both in creating a narrow definition of first degree murder and as an aggravating circumstance); *see also Berry v. State,* 703 So.2d 269, 285–86 (Miss.1997) (rejecting a similar claim based on the Supreme Court's holding in *Lowenfield* ); *People v. Seaton,* 26 Cal.4th 598, 110 Cal.Rptr.2d 441, 28 P.3d 175, 231 (2001) (rejecting a similar argument regarding the underlying felony of robbery). Our statutory scheme ensures that capital sentencing in New Mexico is "limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most

deserving of execution.'" *Simmons,* 543 U.S. at ——, 125 S.Ct. at 1194 (quoting *Atkins v. Virginia,* 536 U.S. 304, 319, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)).

{29} Defendant also argues that there was insufficient evidence to instruct the jury on the aggravating circumstance of kidnapping, relying on *State v. Henderson,* 109 N.M. 655, 661, 789 P.2d 603, 609 (1990), *overruled on other grounds by Clark v. Tansy,* 118 N.M. 486, 493, 882 P.2d 527, 534 (1994). Defendant's reliance on *Henderson* is misplaced. In that case, the trial court instructed the jury on three aggravating circumstances, murder of a witness, murder during the course of a kidnapping and murder during the course of criminal sexual penetration. *Id.* at 657, 789 P.2d at 609. This Court held that the instruction on murder during the course of a kidnapping was improper because the State argued that "in raping his victim [the defendant] *simultaneously* kidnapped her." *Id.* at 661, 789 P.2d at 609 (emphasis added). The Court held that allowing aggravating factors for both the rape and the kidnapping would mean that "virtually every rape would be simultaneously a kidnapping, and ... such reasoning does not suffice to establish the statutory aggravating circumstance." *Id.* In *Henderson,* there was no evidence that the defendant "intended to kill his victim during the commission of a kidnapping." *Id.* However, we were very careful to distinguish our analysis in *State v. Guzman,* 100 N.M. 756, 676 P.2d 1321 (1984). "[T]he kidnapping and rape in this case, unlike the kidnapping and rape in *Guzman,* are inseparable." *Henderson,* 109 N.M. at 661, 789 P.2d at 609. "In *Guzman* it was obvious that the defendant intended to kill his kidnapped victim during the course of the kidnapping." *Id.* "In *Guzman,* there was a separate and distinct kidnapping, which took place a definite period of time before the murder occurred.... [T]he kidnapping already had been completed before the CSP and murder occurred." *Id.* at 660 n. 1, 789 P.2d at 608 n. 1.

{30} In this case, there is no danger of multiplying a single aggravating factor into two aggravating factors. Although the State charged Defendant with attempted CSP, this

case does not involve the aggravating circumstance of murder in the course of a CSP. The jury was instructed on a single aggravating circumstance. Further, as in *Guzman,* the kidnapping had already been completed, although continuing, before the attempted CSP and murder. The kidnapping was complete, though continuing, either at the convenience store or when the victim got out of the car on the dirt road and Defendant persuaded her to return to the vehicle. At both times, a rational jury could reasonably conclude from the evidence that Defendant lured the victim into his car by deception with the intent to inflict a sexual offense on the victim. *See Allen,* 2000–NMSC–002, ¶ 75, 128 N.M. 482, 994 P.2d 728; *see also* § 30–4–1(A)(4). When dealing with an already completed but continuing kidnapping, this Court has affirmed instructions on the aggravating circumstance of kidnapping on a number of occasions. *E.g., State v. Jacobs,* 2000–NMSC–026, ¶¶ 56–57, 129 N.M. 448, 10 P.3d 127; *Allen,* 2000–NMSC–002, ¶ 75, 128 N.M. 482, 994 P.2d 728. Applying "a degree of scrutiny that reflects 'the qualitative difference of death from all other punishments,'" *Allen,* 2000–NMSC–002, ¶ 61, 128 N.M. 482, 994 P.2d 728 (quoting *California v. Ramos,* 463 U.S. 992, 998, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983)), we conclude on the basis of our prior cases that there was sufficient evidence for the instruction, and we also conclude that *Henderson* is inapposite.

{31} Defendant finally contends with respect to the aggravating circumstance that the jury was not instructed properly because the instructions did not distinguish between evidence of kidnapping and evidence of sexual assault and murder. However, the jury instruction for the aggravating circumstance required a finding that the victim was killed during the course of a kidnapping and that Defendant had an intent to kill. In rejecting a nearly identical argument in *Allen,* we were "satisfied that the jury understood the factual distinctions necessary to find the aggravating circumstance of murder in the commission of a kidnapping without more precise definition from the court." 2000–NMSC–002, ¶ 77, 128 N.M. 482, 994 P.2d 728. We reached a similar conclusion in *Jacobs:* "The standard instruction contained all the elements necessary to establish the aggravating circumstance of the murder in the commission of a kidnapping and the evidence established the occurrence of a separate and distinct kidnapping." 2000–NMSC–026, ¶ 59, 129 N.M. 448, 10 P.3d 127. We conclude that this argument is without merit.[5]

## V. BALANCING THE AGGRAVATING CIRCUMSTANCES WITH THE MITIGATING CIRCUMSTANCES

{32} Under New Mexico's capital sentencing scheme, the jury is required to find an aggravating circumstance beyond a reasonable doubt. § 31–20A–3. If the jury does so, the Legislature has provided that the jury then determine whether any mitigating circumstances exist and specify the sentence only "[a]fter weighing the aggravating circumstances and the mitigating circumstances, weighing them against each other, and considering both the defendant and the crime." NMSA 1978, § 31–20A–2(B) (1979). The jury can sentence a defendant to death only if it unanimously determines that the aggravating circumstances outweigh the mitigating circumstances. UJI 14–7030 NMRA 2005. However, "[t]here is no requirement in the Capital Felony Sentencing Act or in the jury instructions which requires

---

5. In the alternative, Defendant contends that his counsel was ineffective for not requesting an instruction that required the jury to find a kidnapping separate and distinct from the sexual assault and the murder. However, we believe, consistent with *Allen* and *Jacobs,* that the instructions given to the jury adequately set out the elements of the offenses and the elements of the aggravating circumstance. Defendant has failed to make a prima facie showing of ineffective assistance. *See State v. Roybal,* 2002–NMSC–027, ¶ 19, 132 N.M. 657, 54 P.3d 61 (stating that an ineffective assistance of counsel claim is more properly brought on collateral review); *Lytle v. Jordan,* 2001–NMSC–016, ¶¶ 25–26, 130 N.M. 198, 22 P.3d 666 (applying the two-part test of *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) requiring a showing that counsel's performance was deficient and that the deficiency prejudiced the defense and also applying the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance") (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052).

that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt." *State v. Finnell*, 101 N.M. 732, 736, 688 P.2d 769, 773 (1984). Defendant argues that recent decisions from the United States Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) require the jury to find that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. On the basis of these cases, he contends that his rights to trial by jury and due process and the prohibition against cruel and unusual punishment require that his sentence be reversed due to the failure of the Capital Felony Sentencing Act to apply the standard of beyond a reasonable doubt to this balancing process. *See* U.S. Const. amends. VI, VIII, XIV; N.M. Const. art. II, §§ 13, 14, 18.

{33} In *Apprendi*, the Supreme Court overturned a sentencing scheme that contemplated an increased penalty for a hate crime upon a finding by a judge, by a preponderance of evidence, that the crime was committed with the purpose of intimidating particular classes of individuals. 530 U.S. at 468–69, 120 S.Ct. 2348. Relying on the constitutional right to due process and to a trial by jury, the Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. 2348. The Court deemed unconstitutional "a legislative scheme that removes the jury from the determination of a fact that, if found, exposes the criminal defendant to a penalty *exceeding* the maximum he [or she] would receive if punished according to the facts reflected in the jury verdict alone." *Id.* at 482–83, 120 S.Ct. 2348. The Supreme Court applied this holding from *Apprendi* to a death penalty proceeding in *Ring*. In that case, the Court determined that *Apprendi* precluded Arizona's system of having the trial judge determine the presence or absence of aggravating factors following a jury verdict on the crime of first degree murder. *Ring*, 536 U.S. at 588–89, 122 S.Ct. 2428. The Court observed that life imprisonment was the maximum punishment available for the crime of first degree felony murder based on the jury verdict alone because the existence of an aggravating circumstance was necessary to make a crime death-eligible. *Id.* at 597, 122 S.Ct. 2428. As a result, the Court determined that "aggravating factors operate as 'the functional equivalent of an element of a greater offense'" and must therefore be found by a jury beyond a reasonable doubt. *Id.* at 609, 122 S.Ct. 2428 (quoting *Apprendi*, 530 U.S. at 494 n. 19, 120 S.Ct. 2348). The Court noted that the vast majority of states authorizing capital punishment, including New Mexico, already placed the responsibility of finding aggravating circumstances with the jury, while only five states, including Arizona, entrusted both capital sentencing factfinding and the ultimate sentencing decision to judges. *Ring*, 536 U.S. at 607–08 & n. 6, 122 S.Ct. 2428.

{34} More recently, the Supreme Court has had further opportunities to explore its holding in *Apprendi*. In *Blakely v. Washington*, 542 U.S. 296, 303–04, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), the Court overturned a sentence of ninety months based on a judicial finding of deliberate cruelty because the maximum sentence allowable by the defendant's guilty plea to the charged offense alone, absent additional factfinding, was fifty-three months. The Court held that such a sentence violates the rule announced in *Apprendi*. *Id.* at 305, 124 S.Ct. 2531. In *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 746, 160 L.Ed.2d 621 (2005), the Court addressed the effect of *Apprendi* on the Federal Sentencing Guidelines. In a divided ruling, the Court held that the mandatory sentencing guidelines, based on judicial findings by a preponderance of the evidence and never submitted to the jury, violated the Sixth Amendment, *id.* at —————, 125 S.Ct. at 749–51, and the Court reaffirmed its holding in *Apprendi* that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Id.* at ——, 125 S.Ct. at 756. However, rather than striking down

the Sentencing Guidelines as a whole, a different majority of the Court took an intermediate remedial approach by invalidating only the mandatory provisions of the Guidelines, "mak[ing] the Guidelines effectively advisory." *Id.* at ——, 125 S.Ct. at 757; *see id.* at ——, 125 S.Ct. at 750 ("[E]veryone agrees that the constitutional issues presented by these cases would have been avoided entirely if Congress had omitted ... the provisions that make the Guidelines binding on district judges....").

{35} It is without question that these cases, and *Ring* in particular, require that an aggravating circumstance be found by a jury beyond a reasonable doubt. Even though, like the Arizona statute at issue in *Ring,* the Legislature has provided that the punishment for first degree murder is life imprisonment or death, § 31–18–14, "the relevant inquiry is one not of form, but of effect." *Apprendi,* 530 U.S. at 494, 120 S.Ct. 2348. As the Supreme Court determined with respect to Arizona's statutory scheme in *Ring,* the requirement of an aggravating circumstance for the imposition of the death penalty in Section 31–20A–3 effectively limits the punishment available upon a guilty verdict of first degree murder alone. *See Ring,* 536 U.S. at 603–04, 122 S.Ct. 2428. As we have indicated, however, the Capital Felony Sentencing Act satisfied the requirement that a jury find an aggravating circumstance beyond a reasonable doubt long before *Apprendi* and *Ring* were decided. The question then is whether, under these recent Supreme Court cases, the jury must also find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances. We conclude that this standard of proof in the weighing process is neither constitutionally nor statutorily required.

{36} In *Ring,* the Court emphasized that the defendant did not "argue that the Sixth Amendment required the jury to make the ultimate determination whether to impose the death penalty" and noted that four states employ a hybrid system under which a jury recommends a sentence but a judge makes the ultimate sentencing determination. *Ring,* 536 U.S. at 597 n. 4, 608 n. 6, 122 S.Ct. 2428. This limitation on the holding in *Ring* is important because it leaves intact the Court's prior holding that "the Constitution does not require a State to adopt specific standards for instructing the jury in its consideration of aggravating and mitigating circumstances." *Stephens,* 462 U.S. at 890, 103 S.Ct. 2733. We relied on this holding from *Stephens* to reject a similar argument about the standard of proof in the jury's weighing of aggravating and mitigating circumstances in *State v. Clark,* 108 N.M. 288, 307–08, 772 P.2d 322, 341–42 (1989), *overruled on other grounds by Henderson,* 109 N.M. at 664, 789 P.2d at 612. In addition, *Ring* did not overrule the Court's prior holding that "there is no constitutional imperative that a jury have the responsibility of deciding whether the death penalty should be imposed." *Spaziano v. Florida,* 468 U.S. 447, 465, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). Following *Ring,* states may continue to allow judges to make the ultimate sentencing determination as long as a jury has found the existence of an aggravating circumstance beyond a reasonable doubt. *See Ring,* 536 U.S. at 612, 122 S.Ct. 2428 (Scalia, J., concurring) ("What today's decision says is that the jury must find the existence of the *fact* that an aggravating factor existed. Those States that leave the ultimate life-or-death decision to the judge may continue to do so...."). In *Harris v. Alabama,* 513 U.S. 504, 506, 515, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), the Supreme Court upheld a sentencing scheme under which a judge determined the sentence by considering, much like the jury in New Mexico, whether the aggravating circumstances outweigh the mitigating circumstances, taking into account a jury's advisory verdict based on the jury's balancing of aggravating and mitigating factors. In reaching this decision, the Supreme Court noted that no " 'specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required.' Equally settled is the corollary that the Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer." *Id.* at 512, 115 S.Ct. 1031 (citation omitted) (quoting *Franklin v. Lynaugh,* 487 U.S. 164, 179, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988)). These obser-

vations remain unchanged by *Apprendi* and its progeny. Because the Supreme Court continues to allow judges to make the final sentencing determination, following the judge's consideration of aggravating and mitigating circumstances, it is clear that the Court did not intend to apply *Apprendi's* requirement of a jury determination beyond a reasonable doubt to the balancing of aggravating and mitigating circumstances in capital cases.

{37} "[T]he pivotal inquiry under *Ring* and *Apprendi* is whether exposure to punishment is increased, not whether the punishment should or should not be imposed in a given case." *Ritchie v. State*, 809 N.E.2d 258, 265 (Ind.2004). In New Mexico, once the jury finds an aggravating circumstance beyond a reasonable doubt, the jury is presented with two sentencing options, life imprisonment or death, and it must exercise its discretion, as guided by the Legislature and the instructions of the court, in choosing between these two statutorily authorized penalties. As part of this exercise of discretion, the jury considers the defendant and the crime and weighs the aggravating and mitigating circumstances. § 31–20A–2. Unlike the existence of an aggravating circumstance, the weighing of aggravating and mitigating circumstances is thus not a "fact that increases the penalty for a crime beyond the prescribed statutory maximum." *Apprendi*, 530 U.S. at 490, 120 S.Ct. 2348. A jury's finding of guilt on the crime of first degree murder and the presence of at least one aggravating circumstance establishes "all facts legally essential to the punishment." *Blakely*, 542 U.S. at 313, 124 S.Ct. 2531. The process of weighing the aggravating and mitigating circumstances is designed to assist the jury in deciding which sentence is proper, not which sentence is available. *See Oken v. State*, 378 Md. 179, 835 A.2d 1105, 1123 (Md.2003) ("[U]nder the Supreme Court's post-*Furman* jurisprudence, in both weighing and non-weighing schemes, it is the finding of an aggravating circumstance which makes the defendant death-eligible."), *cert. denied*, 541 U.S. 1017, 124 S.Ct. 2084, 158 L.Ed.2d 632 (2004). As a result, the balancing process is not a "fact necessary to constitute the crime with which [the defendant] is charged" such that it

would invoke the constitutional requirement of proof beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Therefore, we agree with the State that the balancing of the aggravating and mitigating circumstances, much like the jury's consideration of "the defendant" in Section 31–20A–2(B), is not susceptible to an *Apprendi/Blakely* analysis. *Apprendi* rests on the notion that the *"truth of every accusation"* should be decided by the jury under a reasonable doubt standard. *Apprendi*, 530 U.S. at 477, 120 S.Ct. 2348 (quotation marks and quoted authority omitted). However, there is no "truth" in the balancing of the proper sentence for the crime and the defendant. It is instead a matter of guided discretion and judgment within the range of permissible punishments of death and life imprisonment, which is the jury's ultimate purpose in capital sentencing in New Mexico. The balancing process does not contemplate the finding of a "fact" that increases a defendant's maximum possible sentence within the meaning of *Apprendi*. *See Ex parte Waldrop*, 859 So.2d 1181, 1189 (Ala.2002) ("[T]he weighing process is not a factual determination...."); *Commonwealth v. Roney*, 581 Pa. 587, 866 A.2d 351, 360 (2005) ("[B]ecause the weighing of the evidence is a function distinct from fact-finding, *Apprendi* does not apply here."). The "fact" that makes a defendant eligible for the death penalty is the aggravating circumstance, combined with a guilty verdict on the crime of first degree murder. *See Ritchie*, 809 N.E.2d at 268 ("The outcome of weighing does not increase eligibility.").

{38} The jury's exercise of discretion in selecting the penalty is equivalent to "a judgment that [aggravating circumstances] present a compelling ground for departure" from a basic sentence to which the Supreme Court referred in *Blakely*, 542 U.S. at 305 n. 8, 124 S.Ct. 2531. While the Court required that the aggravating circumstances underlying this "judgment" be found by a jury beyond a reasonable doubt, it did not interfere with or impose a heightened standard on this traditional sentencing judgment by a sentencing authority:

We should be clear that nothing in this history [of requiring juries to find all facts essential to a higher degree of punishment than the verdict alone would support] suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute.

*Apprendi,* 530 U.S. at 481, 120 S.Ct. 2348. As indicated by the direction to the jury in Section 31–20A–2 to consider both the defendant and the crime, in addition to weighing the aggravating and mitigating circumstances, it is precisely this type of guided sentencing discretion that is contemplated once the jury finds an aggravating circumstance beyond a reasonable doubt. Indeed, in *Booker,* the Court stressed that,

[i]f the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment. We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range.... For when a trial judge exercises his [or her] discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant.

543 U.S. at —, 125 S.Ct. at 750. Under the Capital Felony Sentencing Act, the weighing of aggravating and mitigating circumstances is designed to assist the jury in "select[ing] a specific sentence within a defined range." *Id.; see Spaziano,* 468 U.S. at 459, 104 S.Ct. 3154 ("[D]espite its unique aspects, a capital sentencing proceeding involves the same fundamental issue involved in any other sentencing proceeding—a determination of the appropriate punishment to be imposed on an individual.").

{39} Moreover, it is significant following the Supreme Court's ruling in *Booker* that the jury's decision after the process of weighing is discretionary rather than mandatory. Even if the jury finds that the aggravating circumstances outweigh the mitigating circumstances, the jury "may still decide not to impose the death penalty." UJI 14–7030.

[T]he jury is instructed that even if aggravating circumstances outweigh mitigating circumstances the jury is free to not impose the penalty of death. The jury is directed to consider both the defendant and the crime. We have recognized that a subjective standard must be used for this review. These instructions adequately focus[ ] the jury's attention on the particularized nature of the crime and the unique characteristics of the individual defendant, as required by the Constitution.

*Clark,* 108 N.M. at 307–08, 772 P.2d at 341–42 (citations omitted). As the Supreme Court held in *Booker, Apprendi's* requirement of a jury finding beyond a reasonable doubt does not apply to a discretionary sentencing judgment between two statutory penalties that are available on the basis of an existing jury verdict, which in this case includes the verdict of guilt on the crime of first degree murder and the determination that an aggravating circumstance exists beyond a reasonable doubt. "[T]he federal constitution requires that eligibility for the death penalty be determined by the jury beyond a reasonable doubt, but it does not require that the decision whether to impose death be made by the jury, and it does not require the weighing, whether by judge or jury, to be under a reasonable doubt standard." *Ritchie,* 809 N.E.2d at 266; *accord Oken,* 835 A.2d at 1122 ("[W]hen taken in the context of the Supreme Court's death penalty jurisprudence, *Ring* only implicates the finding of aggravating circumstances, and not the process of weighing aggravating against mitigating factors."); *Roney,* 581 Pa. at 601, 866 A.2d at 360 ("[A]s evident in *Ring, Apprendi* narrowly focused on a jury's fact-finding responsibility and did not involve any question concerning whether the 'beyond a reasonable doubt' standard applies to a jury's **weighing** of the aggravating and mitigating circumstances **after** the defendant has been found eligible for the death penalty.").

{40} The Supreme Court's intention that *Apprendi* not apply to a discretionary sentencing judgment, such as the balancing of

aggravating and mitigating factors, is further revealed by the Court's continued adherence to *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), which was cited with approval in *Apprendi*, 530 U.S. at 481, 120 S.Ct. 2348, and distinguished in *Blakely*, 542 U.S. at 304–05, 124 S.Ct. 2531. In *Williams*, the Supreme Court allowed a judge to consider facts outside the record in a pre-sentence investigation report in determining whether to sentence a defendant to death under an indeterminate sentencing scheme. 337 U.S. at 242–43, 69 S.Ct. 1079. The judge considered the defendant's criminal history and some material facts from a pre-sentence investigation concerning the defendant's background that he believed relevant to the question of punishment but that could not have been properly introduced during the guilt phase of the trial. *Id.* at 244, 69 S.Ct. 1079. The Court stated,

> [T]ribunals passing on the guilt of a defendant always have been hedged in by strict evidentiary procedural limitations. But both before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him [or her] in determining the kind and extent of punishment to be imposed within limits fixed by law.

*Id.* at 246, 69 S.Ct. 1079 (footnote omitted). "Highly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Id.* at 247, 69 S.Ct. 1079. These principles reflect "a prevalent modern philosophy of penology that the punishment should fit the offender and not merely the crime." *Id.* As with the information considered by the judge in *Williams*, the weighing of aggravating and mitigating circumstances assists the jury in its discretionary task of selecting between two sentences authorized by law in order to ensure that the penalty imposed fits both the offender and the crime. For the above reasons, we believe that the Supreme Court did not intend for its opinions in *Apprendi* and *Blakely* to apply to a decision of the type at issue in this case.

{41} Defendant alternatively argues that, in light of these Supreme Court cases, we should as a matter of statutory construction interpret Section 31–20A–2 to require that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. We have previously rejected this argument. "If the Legislature had intended for this burden to be beyond a reasonable doubt in death penalty cases, it would have so stated in the Capital Felony Sentencing Act." *Finnell*, 101 N.M. at 736, 688 P.2d at 773. This interpretation of Section 31–20A–2 has been in force without legislative change for over twenty years. We do not believe that there is a compelling reason to reconsider this precedent. *See State ex rel. Martinez v. City of Las Vegas*, 2004–NMSC–009, ¶ 24, 135 N.M. 375, 89 P.3d 47 ("Based on the importance of stare decisis, we require a compelling reason to overrule one of our prior cases.") (quotation marks and quoted authority omitted); *see also Patterson v. McLean Credit Union*, 491 U.S. 164, 172–73, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) ("Considerations of *stare decisis* have special force in the area of statutory interpretation, for here, unlike in the context of constitutional interpretation, the legislative power is implicated, and Congress remains free to alter what we have done."). We conclude that the jury is not required to find that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt in order to specify a sentence of death.

## VI.  PROPORTIONALITY

{42} Defendant next argues that his sentence is disproportionate to the penalty imposed in similar crimes. "[P]roportionality review is a post-sentence inquiry, undertaken to identify disparities in capital sentencing and to prevent the death penalty from being administered in an arbitrary, capricious, or freakish manner." *State v. Wyrostek*, 117 N.M. 514, 522, 873 P.2d 260, 268 (1994). In undertaking a proportionality review, this Court has long applied a "precedent-seeking approach." *Clark*, 1999–NMSC–035, ¶ 74, 128 N.M. 119, 990 P.2d 793; *see State v. Garcia*, 99 N.M. 771, 780, 664 P.2d 969, 978 (1983). Under this ap-

proach, we compare the facts of the offense and all other aggravating or mitigating evidence with "only New Mexico cases in which a defendant has been convicted of capital murder under the *same aggravating circumstance(s)*" and "[o]nly those New Mexico cases in which a defendant was convicted under the same aggravating circumstance(s) and then received *either* the death penalty *or* life imprisonment and whose conviction and sentence have been upheld previously by this Court." *Garcia,* 99 N.M. at 780, 664 P.2d at 978.

{43} From our review of New Mexico capital cases, it appears that only one case fits this criteria exactly, *Gilbert,* 100 N.M. 392, 671 P.2d 640. In *Gilbert,* the defendant was convicted of two murders. *Id.* at 395, 671 P.2d at 643. For one murder, the jury found the aggravating circumstances of kidnapping and murder of a witness. *Id.* For the other murder, the jury found, as in the present case, only the aggravating circumstance of kidnapping. *Id.* The jury imposed a sentence of death for both murders, *id.,* and this Court, in affirming the sentences, held that the sentences were not disproportionate. *Id.* at 402–03, 671 P.2d 640. The second murder supported only by the aggravating circumstance of kidnapping is a proper comparison case under *Garcia.* Defendant relies on two cases in which the jury found two different aggravating circumstances, murder during the course of a kidnapping and murder of a witness, but imposed a life sentence, *State v. McGuire,* 110 N.M. 304, 306, 795 P.2d 996, 998 (1990), and *Hutchinson,* 99 N.M. at 619 n. 1, 661 P.2d at 1318 n. 1 (1983). Because these cases involved an additional aggravating circumstance, they do not strictly satisfy the *Garcia* criteria. However, we have previously considered factually similar cases in which the jury found the same aggravating circumstance or circumstances and either found an additional aggravating circumstance or found fewer aggravating circumstances. *Clark,* 1999–NMSC–035, ¶¶ 78–79, 128 N.M. 119, 990 P.2d 793 (comparing a case in which

the jury found the aggravating circumstances of murder of a witness and murder in the course of a kidnapping to *Guzman,* 100 N.M. at 760–61, 676 P.2d at 1325–26, in which the jury found the same two aggravating circumstances as well as the aggravating circumstance of murder during the commission of criminal sexual penetration); *Guzman,* 100 N.M. at 762, 676 P.2d at 1327 (comparing three aggravating circumstances to several cases, including *Hutchinson* and *Gilbert,* in which the jury found only two of those three aggravating circumstances); *State v. Cheadle,* 101 N.M. 282, 288, 681 P.2d 708, 716 (1983) (comparing two aggravating circumstances to *Simonson,* 100 N.M. 297, 669 P.2d 1092, in which the jury found only one of the two aggravating circumstances). As a result, we will review *McGuire* and *Hutchinson,* as well as those cases in which the jury found the aggravating circumstance of murder during the commission of a kidnapping and in which we affirmed a sentence of death, *Allen,* 2000–NMSC–002, ¶ 111, *Clark,* 1999–NMSC–035, ¶¶ 79–80, 128 N.M. 119, 990 P.2d 793, *Guzman,* 100 N.M. at 762, 676 P.2d at 1327, and the second murder in *Gilbert.*[6]

{44} In conducting our review for proportionality, we also consider "both the crime and the defendant." § 31–20A–4(C)(4); *see Clark,* 1999–NMSC–035, ¶ 81, 128 N.M. 119, 990 P.2d 793; *Wyrostek,* 117 N.M. at 519, 873 P.2d at 265 ("The determination of whether a death sentence is excessive or disproportionate requires review of the facts in the trial record pertaining to the crime, including evidence of aggravation and mitigation."). Comparing this case to those mentioned above, *Allen, Clark, McGuire, Gilbert, Guzman,* and *Hutchinson,* and considering the crime and Defendant, we do not believe that the jury's specification of the death penalty is freakish, capricious, or arbitrary. Defendant killed the victim in a particularly brutal fashion by striking her in the head three to five times with a sledgehammer. This occurred after Defendant kidnapped the victim by deception, chased her

**6.** We reject Defendant's reliance on *Jacobs.* In that case, a jury found a single aggravating circumstance of murder in the commission of a kidnapping and specified a sentence of death. 2000–NMSC–026, ¶ 1, 129 N.M. 448, 10 P.3d

127. However, we reversed the sentence and remanded for a new sentencing proceeding on grounds other than proportionality. *Id.* ¶¶ 67–69. As a result, *Jacobs* does not satisfy the *Garcia* test.

as she attempted to escape and stabbed her two inches deep in the chest with a knife when she struggled, and completely disrobed the victim in an attempt to rape her. Of the comparison cases, the facts in this case are most similar to those in *Allen*, 2000–NMSC–002, ¶¶ 2–14, 128 N.M. 482, 994 P.2d 728, a case in which we affirmed a sentence of death. We reiterate that "[p]roportionality *review* in New Mexico is first and foremost directed to the particular circumstances of a crime and the specific character of the defendant." *Garcia*, 99 N.M. at 781, 664 P.2d at 979. We conclude that the sentence is not excessive or disproportionate.

{45} Defendant argues that this Court should overrule our earlier case law and compare his sentence to all first degree murder charges that were death-eligible, regardless of whether the death penalty was actually sought. Defendant, however, misunderstands the purpose of proportionality review. As this Court has explained, it is not to ensure perfect symmetry in sentencing but only to ensure that a death sentence is not "freakish, arbitrary, or capricious." *Clark*, 1999–NMSC–035, ¶ 80, 128 N.M. 119, 990 P.2d 793. The precedent-seeking approach is narrowly tailored for this purpose, and this Court has twice recently rejected similar claims to abandon this approach. *See Allen*, 2000–NMSC–002, ¶ 111, 128 N.M. 482, 994 P.2d 728; *Clark*, 1999–NMSC–035, ¶¶ 75–76, 128 N.M. 119, 990 P.2d 793. We adhere to the precedent-seeking approach from *Garcia*.

## VII. REMAINING PENALTY–PHASE ISSUES

{46} Although not raised by Defendant, we also review the record to determine whether the evidence supports the finding that the mitigating circumstances outweighed the aggravating circumstances and whether the sentence was the product of passion, prejudice, or another arbitrary factor. *See* § 31–20A–4(C)(2), (3); *see also Allen*, 2000–NMSC–002, ¶ 81, 128 N.M. 482, 994 P.2d 728. At the sentencing hearing, Defendant presented the testimony of four witnesses. A psychologist testified that it was his opinion that there was less than a ten percent likelihood that Defendant would commit violence

against other prisoners and a less than one percent likelihood of violence against prison guards while serving a life sentence in prison. A pastor testified that Defendant had grown spiritually while in prison and also read letters from two of Defendant's sisters describing Defendant's childhood. Defendant's mother and father also testified about Defendant's childhood and indicated a desire to continue seeing their son while he was in prison. Defendant's mother testified that he was a volunteer firefighter and had been in the Navy. Defendant also offered a videotape depicting the conditions in the maximum security section of the prison, and the trial judge informed the jury that, based on a life sentence for first degree murder and the sentences he received for the other crimes of which the jury found him guilty, Defendant would not be eligible for release from prison for sixty-seven years. Following our thorough review of the record, we conclude that the evidence from the trial and sentencing proceeding supports the jury's determination that the aggravating factor outweighs the evidence offered in mitigation.

{47} We also conclude that the sentence was not the product of passion, prejudice, or any other arbitrary factor. Although the State introduced victim impact evidence, its presentation was limited to only four witnesses, the victim's brother, two sisters, and daughter, and was "brief in nature and narrow in scope and purpose." *Clark*, 1999–NMSC–035, ¶ 45, 128 N.M. 119, 990 P.2d 793. We have explicitly allowed " 'evidence about the victim and about the impact of the murder on the victim's family [that] is relevant to the jury's decision as to whether or not the death penalty should be imposed.' " *Allen*, 2000–NMSC–002, ¶ 55, 128 N.M. 482, 994 P.2d 728 (quoting *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)); *accord Jacobs*, 2000–NMSC–026, ¶ 64, 129 N.M. 448, 10 P.3d 127; *Clark*, 1999–NMSC–035, ¶¶ 35–45, 128 N.M. 119, 990 P.2d 793.

## VIII. GUILT–PHASE ISSUES

{48} Defendant raises three guilt-phase issues: (1) prosecutorial misconduct in closing; (2) an improper comment by a witness

on Defendant's character; and (3) erroneous admission of expert testimony. We address each of these claims in turn.

{49} Defendant first argues that the trial court erred in not granting a mistrial based on a comment by the prosecutor in closing argument. During the trial, the State sought to admit several photographs of the victim's body as reference material for the testimony of the medical investigator, and the prosecutor indicated an attempt to be "very conservative" in selecting the photographs for the jury, indicating that those offered were the "least bloody" available. In the course of an extended bench conference on the subject, the trial judge expressed concern about the graphic nature of some of the photographs and also about minimizing the amount of nudity shown in the photographs. The prosecutor offered to withdraw some pictures, either based on the availability of other means to demonstrate the wounds to the jury or out of respect for the victim and the victim's family, and the trial judge ordered that some of the photographs be cropped. After the prosecutor cut the photographs, the trial judge indicated that the prosecutor "actually ... took out more than [he] had to," and the judge admitted two full photographs and three slivers of photographs that had been cropped. The trial judge warned the jury,

> [W]e're going to be dealing with some issues at this point that as far as the medical investigator's testimony, some is going to be a little like we've used the term graphic, okay. There will be some photographs and some diagrams but the photographs will only come at the end of [the witness's] testimony and then we're going to take a break, ... and we have worked— we've been working on those photographs so that they will show what they are supposed to show and nothing more and we've tried to minimize the graphicness as much as possible.

The medical investigator testified in detail about the numerous wounds to the victim's body. During closing argument, the prosecutor referred to Defendant's statement to the police on the day following the murder that he had a great night up until the time

that his car got stuck and described the sequence of events leading up to the victim's death to place that statement in context. In the course of this recitation, the prosecutor described the victim's physical state as "so grotesque you could not be allowed to see it." The judge denied defense counsel's oral motion for a mistrial following closing argument, and Defendant later filed a written motion for mistrial. The prosecutor informed the court that he did not show or describe the excised portions of the photographs, that the medical investigator's testimony had demonstrated the graphic nature of the injuries, that the statement in closing had resembled the judge's own explanation of the cropped photographs to the jury, and that the closing argument had been intended to show Defendant's demeanor following the crime rather than to evoke an emotional response by the jury. The trial court denied the motion.

{50} We review a trial court's denial of a motion for mistrial on the basis of remarks made in closing argument for an abuse of discretion. "The trial court has wide discretion in controlling counsel's argument to the jury...." *State v. Sanchez*, 120 N.M. 247, 253, 901 P.2d 178, 183 (1995). An "[a]buse of discretion exists when the trial court acted in an obviously erroneous, arbitrary, or unwarranted manner." *State v. Stills*, 1998–NMSC–009, ¶ 33, 125 N.M. 66, 957 P.2d 51 (quotation marks and quoted authority omitted). "During closing argument, both the prosecution and defense are permitted wide latitude...." *State v. Smith*, 2001–NMSC–004, ¶ 38, 130 N.M. 117, 19 P.3d 254. "The question on appeal is whether the argument served to deprive defendant of a fair trial." *State v. Chamberlain*, 112 N.M. 723, 729, 819 P.2d 673, 679 (1991). In order to answer this question, we review the comment in context with the closing argument as a whole and in the context of the remaining trial proceedings "so that we may gain a full understanding of the comments and their potential effect on the jury." *State v. Armendarez*, 113 N.M. 335, 338, 825 P.2d 1245, 1248 (1992).

{51} We agree with the State that the prosecutor did no more than repeat what the judge had already said to the jury, that

is, that the photographs contained more graphic material than the jurors were allowed to see, and rely on reasonable inferences from the medical investigator's testimony about the graphic nature of the wounds. Thus, the prosecutor did not introduce any new information to the jury. Viewing this isolated remark in context with the judge's comments to the jury, with the testimony of the medical investigator, and with the overwhelming evidence of guilt, we conclude that the remark did not result in a verdict based on passion or prejudice or otherwise deprive Defendant of a fair trial.[7] "The general rule is that an isolated comment made during closing argument is not sufficient to warrant reversal." *State v. Brown*, 1997–NMSC–029, ¶ 23, 123 N.M. 413, 941 P.2d 494; *accord Smith*, 2001–NMSC–004, ¶ 38, 130 N.M. 117, 19 P.3d 254. *See generally State v. Sellers*, 117 N.M. 644, 650, 875 P.2d 400, 406 (Ct.App.1994) ("Appellate review provides a very limited opportunity for relief from poorly worded remarks...."). We conclude that the trial court did not abuse its discretion in denying the motion for mistrial.

{52} Defendant also argues that the judge should have granted a mistrial due to a witness's remark about Defendant's character of meanness. "We review a trial court's denial of a motion for mistrial under an abuse of discretion standard." *State v. Gonzales*, 2000–NMSC–028, ¶ 35, 129 N.M. 556, 11 P.3d 131. The witness's remark referenced by Defendant, that Defendant had always "seemed a little mean," was in response to a question about Defendant's behavior on the night of the murder, and the prosecutor promptly told the witness after the remark that he was asking only about the night in question. Thus, this remark was not elicited by the prosecutor. Defendant did not object to the remark at the time but moved for a mistrial at the end of the witness's testimony, following cross-examination. The judge denied the motion for mistrial but offered to give a curative instruction, which Defendant refused.

{53} "We have previously distinguished between inadvertent remarks made by a witness about a defendant's inadmissible prior crime or wrong and similar testimony intentionally elicited by the prosecutor." *Gonzales*, 2000–NMSC–028, ¶ 39, 129 N.M. 556, 11 P.3d 131. For an inadvertent remark of the type at issue in this case, we have held that the trial court's offer to give a curative instruction, even if refused by the defendant, is sufficient to cure any prejudicial effect. *See id.* ¶ 37; *State v. Simonson*, 100 N.M. 297, 301, 669 P.2d 1092, 1096 (1983). We conclude that Defendant has failed to show an abuse of discretion.

{54} Defendant finally argues that the trial court erred in admitting expert testimony on blood spatter analysis. Our Rules of Evidence provide, "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise." Rule 11–702 NMRA 2005. "The purpose of Rule 11–702 is to assist the trier of fact to understand the evidence and to determine the issues of fact." *Lee v. Martinez*, 2004–NMSC–027, ¶ 15, 136 N.M. 166, 96 P.3d 291 (quotation marks and quoted authority omitted). We have explained that Rule 11–702 creates three prerequisites for the admission of expert testimony: (1) the expert must be qualified; (2) the testimony must assist the trier of fact; and, "closely related" to the second requirement, (3) the expert may testify only as to "scientific, technical or other specialized knowledge." *State v. Alberico*, 116 N.M. 156, 166, 861 P.2d 192, 202 (1993). With respect to the latter two prerequisites, we have rejected the overly restrictive test from *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923) that had required general acceptance in the field in order for opinion testimony to be considered scientific knowledge that will assist the trier of fact in favor of a more flexible test that focuses on "the validity and the soundness of the scienti-

---

7. For similar reasons, we reject Defendant's argument that this remark in closing argument during the guilt-phase of the trial resulted in a sentence based on passion or prejudice. *Cf. Clark*, 1999–NMSC–035, ¶¶ 51–55, 128 N.M. 119, 990 P.2d 793.

fic method used to generate the evidence." *Alberico*, 116 N.M. at 167, 861 P.2d at 203. We relied on the analysis of the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) to specify "[s]everal factors [that] could be considered by a trial court in assessing the validity of a particular technique to determine if it is 'scientific knowledge' under Rule [11–]702." *Alberico*, 116 N.M. at 168, 861 P.2d at 204. These factors include, but are not limited to, the following:

(1) whether a theory or technique "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known potential rate of error" in using a particular scientific technique "and the existence and maintenance of standards controlling the technique's operation"; ... (4) whether the theory or technique has been generally accepted in the particular scientific field ... [; and (5) ] "whether the scientific technique is based upon well-recognized scientific principle and whether it is capable of supporting opinions based upon reasonable probability rather than conjecture."

*State v. Anderson*, 118 N.M. 284, 291, 881 P.2d 29, 36 (1994) (quoting *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786, and *Alberico*, 116 N.M. at 167, 861 P.2d at 203).

{55} We review Defendant's claim in this case for an abuse of discretion. *See Alberico*, 116 N.M. at 169, 861 P.2d at 205 ("The rule in this State has consistently been that the admission of expert testimony or other scientific evidence is peculiarly within the sound discretion of the trial court and will not be reversed absent a showing of abuse of that discretion."). "Given the capabilities of jurors and the liberal thrust of the rules of evidence, we believe any doubt regarding the admissibility of scientific evidence should be resolved in favor of admission, rather than exclusion." *Lee*, 2004–NMSC–027, ¶ 16, 136 N.M. 166, 96 P.3d 291.

{56} Defendant filed a motion in limine to exclude the expert testimony prior to trial. During a hearing on the motion, the State's expert testified that he had been admitted as an expert on bloodstain pattern analysis in twenty-five jurisdictions and had testified approximately 300 times. He testified that bloodstain pattern analysis has existed since 1895 and is in widespread practice today throughout the world. He testified that blood spatter analysis has been tested for accuracy and can produce accurate results. He also testified that it is based on the underlying science of physics, as well as mathematics. He further testified that it is based upon a set of standards that are accepted across the nation and even worldwide. The expert indicated that there are a number of organizations that monitor the field and assist in the management of standards and in education. He also stated that there is a body of literature on the subject, including journals and treatises. Finally, he testified that bloodstain pattern analysis is generally accepted in the scientific community. The State also introduced the testimony of another expert who assisted the State's primary expert and who did not testify at trial. This expert also testified that blood spatter analysis is generally accepted in the scientific community and subjected to peer review. Following this testimony, defense counsel conceded that there were many aspects of blood spatter analysis that were beyond the common understanding of average jurors and that the testimony could be helpful to jurors, but requested that the trial court limit the testimony with respect to making conclusions about the specific evidence in the case or about Defendant's guilt. The trial court determined that blood spatter analysis is a discipline recognizable under this Court's prior cases and admissible under Rule 11–702, and the court determined that both of the State's witnesses at the hearing were qualified as experts in blood spatter analysis. The court indicated that it would resolve the limits of the expert's testimony during the trial if necessary.

{57} Prior to hearing the experts' testimony at the hearing, the trial judge indicated that he had researched the issue and learned that approximately twenty-six states permit expert testimony on blood spatter analysis. Defendant highlights this remark by the trial judge and contends that it demonstrates that

the court's ruling is inconsistent with our admonition that "[i]t is improper to look for scientific acceptance only from reported case law." *Alberico*, 116 N.M. at 167, 861 P.2d at 203; *accord State v. Torres*, 1999–NMSC–010, ¶ 38, 127 N.M. 20, 976 P.2d 20. However, the trial court conducted a full *Daubert/Alberico* hearing and concluded that the evidence met the requirements of Rule 11–702 under *Alberico* and *Torres*. The trial court did not rely solely on the acceptance of the evidence in other jurisdictions but also on the testimony establishing that blood spatter analysis can be and has been tested, has been subjected to peer review and publication, is conducted under a set of standards that are maintained in order to control the technique's operation, is generally accepted in the particular scientific field, is based on well established scientific principles, and is capable of producing opinions based on reasonable probability rather than speculation or conjecture. In fact, Defendant also offered his own expert testimony on blood spatter evidence, which the trial court similarly admitted. The trial court's ruling fully satisfies the requirements we set out in *Alberico* and subsequent cases. Defendant thus fails to demonstrate an abuse of discretion by the trial court. Because Defendant has failed to demonstrate error, we also reject Defendant's cumulative error argument. *See State v. Nieto*, 2000–NMSC–031, ¶ 31, 129 N.M. 688, 12 P.3d 442.

## IX. CONCLUSION

{58} This Court has previously rejected similar challenges to the excusal of jurors due to their religious opposition to the death penalty because the excusals were not based on the prospective jurors' religious beliefs but instead based on a lack of impartiality and a failure to follow the law. Death-qualified juries represent a necessary balance between the right to a jury panel composed of a fair cross-section of the community and the right of each party to challenge a juror for bias. In accordance with the Legislature's decision to have the original jury determine sentencing in capital cases, jurors who are biased with respect to one part of a case are properly excused from all parts of the case due to an inability to follow the court's instructions.

{59} The general verdict form did not prejudice the sentencing phase because the jury had to find an intent to kill as an element of the aggravating circumstance. This element, combined with New Mexico's strict construction of felony murder, properly narrows the class of defendants eligible for the death penalty, and the Legislature has explicitly provided that felony murder is a capital felony eligible for the death sentence if one of the aggravating circumstances is present.

{60} As in *Allen*, there was sufficient evidence of the aggravating circumstance of kidnapping as having been completed, though continuing, from the time that Defendant lured the victim into his car by deception with the intent to commit a sexual assault. Because the aggravating circumstance of kidnapping requires an intent to kill, there is no double use of kidnapping for both felony murder and an aggravating circumstance.

{61} *Apprendi, Ring,* and *Blakely* do not apply because a balancing of aggravating and mitigating circumstances, like consideration of the defendant and the crime, is a matter within the discretion and judgment of the jury in its decision of which of two prescribed penalties should be imposed. Unlike the fact of the existence of an aggravating circumstance, this balancing is not a fact that increases the possible maximum penalty.

{62} The death penalty is not disproportionate considering the comparison case of *State v. Gilbert* and the nature of the offense. Defendant brutally and repeatedly struck the victim in the back of the head with a sledgehammer after kidnapping her, removed her to an isolated location and attempted to rape her.

{63} The isolated remark in closing argument did not inform the jury of any information that the jurors did not already know and did not, in the context of the argument as a whole, create reversible error. The trial court did not abuse its discretion in denying Defendant's motion for mistrial on the basis of the introduction of improper character evidence because the witness's remark was

inadvertent and the trial court offered to cure the error with a curative instruction. Finally, the trial court properly applied *Daubert* and the rulings of this Court in its application of Rule 11–702 to admit the expert testimony, and Defendant has failed to show an abuse of discretion in the trial court's admission of the expert testimony.

{64} We conclude that Defendant's arguments are without merit. We therefore affirm Defendant's convictions and sentence.

{65} **IT IS SO ORDERED.**

WE CONCUR: PAMELA B. MINZNER, PETRA JIMENEZ MAES, EDWARD L. CHÁVEZ, Justices, and RICHARD C. BOSSON, Chief Justice (concurring in part and dissenting in part).

BOSSON, Chief Justice (concurring in part, dissenting in part).

{66} This case is not just about Robert Fry. It is also about the State and whether the State has to live up to its own rules when it sentences a man to death. Because I am convinced that the State did not do it right, I would remand for a new sentencing hearing before a properly instructed jury, fully informed in the law. I concur in the remainder of the majority opinion and concur particularly in the decision to uphold the guilty verdict.

{67} Before imposing the most severe sentence our society permits, death, the constitution requires us to limit the sentence to only the most egregious crimes under the most egregious circumstances. *See generally Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). To impose the death penalty, the United States Supreme Court requires the states to create a sentencing scheme that guides the discretion of the jury, insuring that the punishment of death is only applied to "materially more depraved" murderers, a narrowly tailored class of the worst offenders. *Godfrey v. Georgia*, 446 U.S. 420, 433, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). As Justice Stewart stated, "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (Stewart, J., Powell, J., and Stevens, J., concurring). The narrowing factors are called aggravators, which must be scrupulously applied to determine whether a defendant falls within the narrow class of the worst offenders eligible for the death penalty.

{68} The United States Supreme Court has determined that to avoid the arbitrary imposition of capital punishment the State must ensure that the aggravating factors "justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant*, 462 U.S. at 877, 103 S.Ct. 2733; *see also McCleskey v. Kemp*, 481 U.S. 279, 305, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *Gregg*, 428 U.S. at 197, 96 S.Ct. 2909. The Court has also found that, "[i]f a state uses aggravating factors in deciding who shall be eligible for the death penalty or who shall receive the death penalty, it *cannot* use factors which as a practical matter fail to guide the sentencer's discretion." *Stringer v. Black*, 503 U.S. 222, 236, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992) (emphasis added).

{69} In New Mexico, our Legislature has adopted statutory aggravating factors to aid the jury in discerning the worst types of homicide and in narrowing the class eligible for the death penalty. NMSA 1978, § 31–20A–5 (1981). At issue in this appeal is the statutory aggravating factor of a "murder ... committed with intent to kill in the commission of or attempt to commit kidnapping." Section 31–20A–5(B). The State has the burden of persuasion and the jury must be adequately instructed on what it must find, in addition to first-degree murder, to sentence the defendant to death.

{70} Defendant Fry was convicted of first-degree murder under a general verdict not specifying upon which theory the jury based its decision. The State presented three different theories to support a finding of first-degree murder: felony murder during the commission of a kidnapping, felony murder

during the attempt to commit criminal sexual penetration, and willful and deliberate murder. Because we do not know under which theory the jury based its decision, we must assume for constitutional purposes that the verdict could have been based upon a finding of felony murder during the commission of a kidnapping. *See State v. Foster*, 1999–NMSC–007, ¶¶ 26–28, 126 N.M. 646, 974 P.2d 140; *State v. Crain*, 1997–NMCA–101, 124 N.M. 84, 946 P.2d 1095; *State v. Rodriguez*, 113 N.M. 767, 772, 833 P.2d 244, 249 (Ct.App. 1992). Certainly, the evidence supports such a verdict.

{71} At the sentencing phase of the trial, the State used only one statutory aggravator, kidnapping. The language of the two uniform jury instructions are very similar. The instruction for felony murder requires that the jury find the following: (1) the defendant committed the crime of kidnapping, (2) the defendant caused the death of victim during the commission of kidnapping, and (3) the defendant intended to kill or knew that his acts created a strong probability of death or great bodily harm. *See* UJI 14–202 NMRA 2005. The Uniform Jury Instructions for the statutory aggravating factor of kidnapping are as follows: (1) the crime of kidnapping was committed, (2) the victim was murdered while the defendant was committing kidnapping, and (3) the defendant had the intent to kill. *See* UJI 14–7015 NMRA 2005.

{72} The jury instructions immediately reveal a problem. If the State used the same kidnapping, both to define first-degree felony murder and then to aggravate that same conviction to make it death eligible, how then has the State truly narrowed the death penalty to only those most heinous offenses? If the jury was not asked to find something significantly more about Defendant than what it had already found in convicting him, then we have a constitutional dilemma on our hands.

{73} The State acknowledges the problem but argues that the "intent to kill" in the statutory aggravating factor is different from, and more exacting than, the lesser intent required for felony murder. *See* UJI 14–7015(3) ("intended to kill or knew that his acts created a strong probability of death").

That may be so, but it is a subtle point at best. This Court has previously construed the felony murder statute, NSMA 1978, § 30–2–1(A)(2) (1994), as "requiring proof that the defendant intended to kill the victim (or was knowingly heedless that his or her acts created a strong probability of death or great bodily harm)." *State v. Ortega*, 112 N.M. 554, 562–63, 817 P.2d 1196, 1204–05 (1991). The jury instructions for felony murder contain the same language. *See* UJI 14–202 ("[Defendant] intended to kill or knew that his acts created a strong probability of death or great bodily harm."). The language of the statutory aggravating factor requires that "the Defendant had the intent to kill." UJI 14–7015(3).

{74} The language in both our case law and our jury instructions for felony murder utilize an intent to kill and a lesser form of second-degree-murder intent based on knowledge, while the instructions for aggravating circumstances that warrant the death penalty use solely the higher intent to kill standard. How can we be so confident the jury was aware or able to discern the difference between the two? More to the point, it does not appear from my reading of the two instructions that the jury was asked to find anything significantly different between the intent necessary to convict Defendant and the intent necessary to execute him. And that omission goes to the heart of the constitutional problem.

{75} Notably, the jury instructions for felony murder include both the intent to kill and the lesser, second-degree-murder intent: "[Defendant] intended to kill or knew that his acts created a strong probability of death or great bodily harm." UJI 14–202; *see also Ortega*, 112 N.M. at 566, 817 P.2d at 1208. To survive *Furman/Zant* scrutiny, the majority opinion assumes that the jury did not find a clear intent to kill during the guilt phase, otherwise the aggravating factor would duplicate the elements of felony murder. *Compare* UJI 14–202 *with* UJI 14–7015(3).

{76} That assumption is fraught with risk. Because the jury instructions group the two intents together, without additional clarification it would be natural for the jury to as-

sume the two intents are similar, if not the same. The distinction is a fine one that would not immediately be apparent to the average juror, unless brought to the jury's attention. Moreover, assuming, as we must, the jury found Defendant guilty of first-degree murder under a felony murder theory based on the lower of the two felony-murder intents, the risk the jury mistakenly believed this intent was consonant with the intent required to satisfy the aggravating circumstance is unacceptable when a person's life hangs in the balance. *Cf. State v. Allen*, 2000–NMSC–002, ¶ 75, 128 N.M. 482, 994 P.2d 728 (an intent to kill can be inferred from the same evidence upon which the jury relied to find the defendant guilty of the willful, deliberate variety of first-degree murder). And that segues into what I conclude to be the fatal error at trial.

{77} At trial, the prosecutor failed to point out this distinction to the jury. During argument to the jury at the sentencing phase, the State never distinguished between the aggravated intent for sentencing purposes ("intent to kill"), and the lesser felony-murder intent necessary for conviction ("knew that his acts created a strong probability of death"). Thus, the jury was never told that it had to find something different about Defendant than what it had already found during the conviction phase. The jury was never told it had to find a different, more aggravated form of intent before it could sentence Defendant to death. Essentially, the jury was left with the impression that it could decide to execute Defendant based on no more than what it had previously found, and in this instance that one fatal omission puts this proceeding squarely in conflict with *Furman* and *Zant*.

{78} The State points to the jury instructions as adequately informing the jury, but the State's own performance at trial effectively confused any such distinction. The State presented no additional evidence during the sentencing phase, nor was the jury instructed to consider anything more, anything that would narrow the jury's focus as it considered the death penalty. Far from clarifying the distinction, the prosecutor told the jury nothing more than, "[t]here are three elements ... [t]he kidnapping was commit-

ted. Betty Lee was murdered while Robert Fry was committing the kidnapping. And he had the intent to kill. There's no new evidence. You are to rely on the evidence that you have heard during the trial." In other words, the jury was led to believe it could sentence Defendant to death based on nothing more than what it had already heard and already decided.

{79} The State did discuss that Defendant's actions evinced an intent to kill, a point with which I wholeheartedly agree. Importantly, however, the State did not distinguish the intent to kill in the aggravating factor from the intent necessary for felony murder, or tell the jury that it must find anything different from what it had already found in the guilt phase. Not being informed that it had to find anything different about Defendant, it is purely conjectural to conclude that the jury in fact found anything different about Defendant.

{80} The failure to instruct the jury that it must find intent to kill separately and apart from the intent necessary to establish felony murder, combined with the prosecutor's misleading argument to the jury, contaminated what followed. In the course of reviewing the most important decision any jury can render, life or death, the jury was left to guess at what it had to find. Absent a true narrowing instruction, and appropriate argument by counsel, we are left with the very tangible possibility that the jury sentenced Defendant to die based on factors that were "aggravating" in name only. Although academicians might understand the fine distinctions between possessing an intent to kill and knowing that certain actions create a strong probability of death or great bodily harm, a reasonable juror, left uninformed by an appropriate jury instruction, may easily confuse the two or consider them one in the same. It defies logic to assume that a jury, presented with many different jury instructions, levels of intent, and theories of the case over the course of capital trial, should be left to discern the intent to kill under the aggravating factor as being a different or higher standard than the intent necessary under felony murder, without proper instruction.

{81} This error is not resolved by this Court's decision in *Allen*. In that case, this Court stated the intent to kill for purposes of the kidnapping aggravating circumstance could be inferred from the same evidence the jury used to convict Allen of first-degree deliberate murder under Section 30–2–1(A)(1). *Allen*, 2000–NMSC–002, ¶ 75, 128 N.M. 482, 994 P.2d 728. By contrast, as discussed above, if the jury found Defendant guilty of felony murder under Section 30–2–1(A)(2), utilizing the lower, second-degree-murder type of intent, it cannot be said an intent to kill can be inferred. Further, the Legislature has made clear in felony murder cases where kidnapping serves as the predicate felony, the second-degree-murder type of intent is insufficient to establish an aggravating circumstance to warrant imposition of the death penalty. *See* § 31–20A–5(B) (requiring murder in the commission of a kidnapping to have occurred "with intent to kill"). Thus, in this situation and unlike *Allen*, the jury must be further instructed on the distinctions between felony-murder intent and intent to kill for purposes of the aggravating circumstance. The jury was not so advised in this case.

{82} The narrowing function of the aggravating factor of kidnapping purports to limit the imposition of the death penalty to only the most heinous of crimes. However, when used with the felony murder statute, the elements overlap. It does not narrow the type of murders, nor does it genuinely distinguish all felony murders from only the felony murder deserving of the death penalty. Today's opinion undermines the very complaint the United States Supreme Court sought to remedy in *Furman*, which is to insure the death penalty is imposed fairly and reserved for only the worst crimes.

{83} We should remand for a new sentencing hearing so that the jury, properly instructed, can make an honest, fully informed decision, consistent with constitutional norms, as to whether to take Defendant's life. If a fully informed jury proceeds to sentence Defendant to death, then based on the record before us I would vote to concur for the reasons so ably discussed in the majority opinion.