# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2021-NMCA-055**

**Filing Date: May 11, 2021**

**No. A-1-CA-37389**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**ENOCK ARVIZO,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Briana H. Zamora, District Judge**

Certiorari Denied, July 13, 2021, No. S-1-SC-38849. Released for Publication November 9, 2021.

Hector H. Balderas, Attorney General
Santa Fe, NM
Charles J. Gutierrez, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Kimberly Chavez Cook, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**BOGARDUS, Judge.**

**{1}** Defendant Enock Arviso was indicted in 2016 for various crimes against inmates, allegedly committed while he was employed as a corrections officer. The district court granted Defendant's unopposed motion to sever the counts relating to separate victims for the purpose of trial. In one of these trials, Defendant was convicted of criminal sexual penetration (CSP) of an inmate, contrary to NMSA 1978, Section 30-9-11(E)(2)

(2009). In a separate trial, Defendant was convicted of two counts of assault and attempted battery, contrary to NMSA 1978, Section 30-3-1(A) (1963).

**{2}**     Regarding his trial for CSP of an inmate, Defendant argues that: (1) the district court erroneously denied his proposed jury instruction defining CSP of an inmate as an act committed without the inmate's consent; and (2) the district court abused its discretion by admitting testimony regarding Defendant's vasectomy and denying Defendant's motion for a mistrial based on that testimony.

**{3}**     Regarding his trial for assault, Defendant argues that (1) the district court abused its discretion by admitting testimony about a voicemail message that Defendant left for Victim approximately one week after the assault; (2) there was insufficient evidence to support Defendant's assault convictions; and (3) Defendant's multiple assault convictions violate double jeopardy.

**{4}**     We discuss separately the background and issues specific to each trial. For the reasons that follow, we affirm.

## BACKGROUND

**{5}**     At Defendant's first trial for two counts of CSP of an inmate, committed against Victim N.S., the jury was instructed in relevant part that "[f]or the act to have been unlawful it must have been done *without consent* and with the intent to arouse or gratify sexual desire." On appeal, Defendant characterizes his defense at his first trial as a theory of "a consensual encounter" with Victim N.S. when she was an inmate. In this first trial, the jury acquitted Defendant of one count and a mistrial was declared after the jury was unable to reach a unanimous verdict on the remaining count of CSP of an inmate.

**{6}**     Following the mistrial, the State retried Defendant for the remaining count of CSP of an inmate. Before this second trial, the district court requested briefing on whether the jury instruction defining unlawfulness for CSP of an inmate should include the language "without consent." Ultimately, the district court determined that the phrase "without consent" was not necessary in the jury instruction because, as a matter of law, an inmate cannot consent to sexual intercourse with a corrections officer in a position of authority over the inmate.

**{7}**     The following was presented at Defendant's second trial for CSP of Victim N.S. On April 13, 2015, Victim N.S., incarcerated due to a probation violation, was transported to the courthouse for her probation revocation hearing. On that day, Victim N.S. wore a standard two-piece inmate's uniform with an elastic waistband. Additionally, she was restrained in four-point shackles, which limit movements by chaining an inmate's ankles together, which are then in turn connected by a chain to handcuffs placed on both of the inmate's wrists.

**{8}** Defendant was one of the corrections officers responsible for transporting Victim N.S. that day. Corrections officers are prohibited from having sexual contact with inmates, and male corrections officers are not allowed to be alone with female inmates in areas without security cameras.

**{9}** After Victim N.S.'s hearing was completed, she returned to a holding cell in the basement of the courthouse; Defendant then told Victim N.S. that her attorney needed to speak with her, and transported her and another female inmate back into the courtroom. While in the courtroom, Victim N.S. fell asleep. Defendant told her that since she could not stay awake, she would have to go back to the holding cell downstairs. Defendant then took Victim N.S. out of the courtroom and into an elevator used to transport inmates from the holding cell to the courtroom, which was inaccessible to the public. Security footage showed Defendant exiting the elevator with Victim N.S., but there were no cameras inside the elevator.

**{10}** Once inside the elevator, Defendant grabbed Victim N.S. roughly, forcibly kissed her, put her hand on his erect penis, and forced her onto her knees, telling her "you know what to do." Victim N.S. performed fellatio on Defendant, after which Defendant pulled her up by her hair, turned her around, and roughly penetrated her vaginally. Victim N.S. described feeling ripping and tearing. After approximately three to four minutes, Defendant told Victim N.S. to pull up her pants and took her from the elevator to a holding cell. When Victim N.S. used the restroom in her holding cell, she found blood and wetness in her underwear, which she interpreted as blood from her injuries and Defendant's ejaculate.

**{11}** Defendant transported Victim N.S. back to the detention center, where she immediately entered a twenty-three-hour lockdown for possessing contraband art supplies that were discovered in her cell. After the lockdown period ended, Victim N.S. showered, but kept her underwear from the day of the assault in a plastic bag. Victim N.S. contacted an advocate lawyer and disclosed the incident with Defendant, which led to a law enforcement investigation and an exam completed by a Sexual Assault Nurse Examiner (SANE). At the exam, Victim N.S. provided the underwear she wore on the day of the assault.

**{12}** Victim N.S. observed Defendant's penis for approximately twenty seconds and testified that although it was difficult for her to discern because his penis was erect, it appeared "pointy" and circumcised. The SANE nurse who examined Victim N.S. testified that a photograph of Defendant's flaccid penis appeared uncircumcised, but she could not be certain without a physical exam because a circumcised penis can appear uncircumcised and likewise, an uncircumcised penis can appear circumcised.

**{13}** The serology report presented at trial identified the presence of semen, but no sperm, on Victim N.S.'s underwear, and additional evidence at trial established that a vasectomy is one reason why a semen sample might not contain sperm. Based on DNA testing, Defendant could not be eliminated as the source of the male DNA on Victim N.S.'s underwear.

**{14}** Another alleged victim (Victim A.S.) of Defendant testified at the same trial. Before she testified, the State reminded the district court of the previous ruling allowing limited testimony from Victim A.S. regarding Defendant's statement that he was "fixed"—that she interpreted to mean Defendant previously had a vasectomy—and asked the district court to further expand the scope of her testimony to include her observations of Defendant's penis and her opinion about whether he was circumcised. After hearing arguments on the issue, the district court permitted testimony regarding Defendant's own statement about being "fixed" but denied the State's request to present additional testimony regarding Victim A. S.'s observations of Defendant's penis and whether she believed he was circumcised.

**{15}** During Victim A.S.'s testimony, when asked who she recognized in the courtroom, she replied that she recognized the prosecutor and Victim N.S.'s advocate; defense counsel immediately asked to approach for a bench conference during which he moved for a mistrial. When Victim A. S. resumed her testimony, the State began by stating, "I realize that you recognize many people from witness interviews with the attorney general's office and that sort of thing. Do you recognize anyone else from prior to that?" Victim A.S. then identified Defendant as someone with whom she had previous contact and testified that Defendant told her that he was "fixed," which she understood to mean that she could not get pregnant if Defendant had sex with her. When later ruling on Defendant's motion for a mistrial, the district court offered a curative instruction, which Defendant declined.

**{16}** The jury convicted Defendant of CSP of an inmate.

**DISCUSSION**

**I.    The District Court Properly Denied Defendant's Proposed Jury Instruction Defining CSP of an Inmate as an Act Committed Without the Inmate's Consent**

**{17}** Defendant contends that "[b]ecause unlawfulness is always an element of CSP," consent is an available defense to CSP of an inmate and therefore Defendant was entitled to a jury instruction defining unlawfulness in terms of lack of consent. The State does not contest that unlawfulness is an element of CSP, but argues that Defendant was not entitled to his proposed instruction because as a matter of law, an inmate cannot consent to sexual intercourse with a corrections officer in a position of authority over the inmate.

**{18}** Because Defendant preserved his objection to the jury instruction given, we review for reversible error. *State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134. Here, the applicability of a consent defense for CSP of an inmate requires statutory interpretation, which this Court reviews de novo. *State v. Martinez*, 2006-NMCA-068, ¶ 5, 139 N.M. 741, 137 P.3d 1195. "In determining what is or is not an essential element of an offense, we begin with the language of the statute itself, seeking of course to give effect to the intent of the [L]egislature." *State v. Stevens*, 2014-NMSC-

011, ¶ 15, 323 P.3d 901 (internal quotation marks and citation omitted). "In interpreting a statute, our primary objective is to give effect to the Legislature's intent." *State v. Trujillo*, 2009-NMSC-012, ¶ 11, 146 N.M. 14, 206 P.3d 125. We begin "by looking first to the words chosen by the Legislature and the plain meaning of the Legislature's language." *State v. Davis*, 2003-NMSC-022, ¶ 6, 134 N.M. 172, 74 P.3d 1064 (internal quotation marks and citation omitted). "The plain meaning rule must yield when equity, legislative history, or other sources demonstrate that applying the plain meaning would result in a construction contrary to the spirit of the statute." *Gandydancer, LLC v. Rock House CGM, LLC*, 2019-NMSC-021, ¶ 14, 453 P.3d 434 (internal quotation marks and citation omitted); *see also Davis*, 2003-NMSC-022, ¶ 6 (noting that legislative history is instructive when "searching for the spirit and reason" behind a statute).

**{19}** We apply these principles of statutory interpretation to discern the legislative intent behind the CSP of an inmate statute. In relevant part, CSP is defined as "the unlawful and intentional causing of a person to engage in sexual intercourse[.]" Section 30-9-11(A). CSP of an inmate, a form of second-degree CSP, is defined as CSP perpetrated "on an inmate confined in a correctional facility or jail when the perpetrator is in a position of authority over the inmate[.]" Section 30-9-11(E)(2).

**{20}** Although the language of the statute contains no specific language addressing consent, our Supreme Court has described consent as a "fundamental concept" of the CSP statute, but specified that such lack of consent may arise either "in fact or in law." *Stevens*, 2014-NMSC-011, ¶ 38. In *Stevens*, the Court addressed the essential elements of second-degree CSP based on the commission of a felony and held that such a charge "must be [based on] a felony that is committed against the victim of, and that assists in the accomplishment of, sexual penetration perpetrated by force or coercion *or against a victim who, by age or other statutory factor, gave no lawful consent.*" *Id.* ¶ 39 (emphasis added). Although our Supreme Court did not consider the issue of inmate consent directly in *Stevens*, it recognized that the Legislature "has never deviated from the common law approach of criminalizing only those sex acts that are perpetrated on persons without their consent, either as a matter of fact or, in the case of children or other vulnerable victims, as a matter of law." *Id.* ¶ 27. Thus, our Supreme Court recognized that in addition to children, certain vulnerable victims—as denoted by "other statutory factor"—cannot consent to CSP as a matter of law. *Id.* ¶ 39.

**{21}** An inmate's ability to consent as a matter of law also was not an issue before our Supreme Court in *Spurlock v. Townes*, nonetheless, the Court recognized in dicta that:

> [t]he essential elements of [the CSP of an inmate statute] are a legislative acknowledgment of the power disparity between inmate and corrections officer and a recognition that this disparity not only facilitates sexual assault of the vulnerable party but makes meaningful voluntary consent to sexual intercourse an unrealistic inquiry.

2016-NMSC-014, ¶ 19, 368 P.3d 1213. We find this description of the legislative intent behind the CSP of an inmate statute particularly instructive. Our Supreme Court aptly

described power disparities inherent to the dynamic between inmates and corrections officers, the role of this power disparity in facilitating sexual assault of vulnerable inmates, and the unrealistic nature of an inquiry into consent in these circumstances.

**{22}**   Based on our Supreme Court's acknowledgement in *Stevens* of vulnerable victims other than children who cannot consent as a matter of law, and our Supreme Court's description in *Stevens* and *Spurlock* of the legislative intent behind the CSP of an inmate statute, we hold that as a matter of law, an inmate cannot consent to sexual intercourse with a perpetrator in a position of authority over the inmate.

**{23}**   We are unpersuaded by Defendant's argument that "position of authority" in the CSP of an inmate statute should be construed to include the element of coercion and/or undue influence based on language found in statutes related to crimes against children. Specifically, Defendant relies on the "position of authority" definition statute, NMSA 1978, § 30-9-10(E) (2005), and the "position of authority" subsections of the criminal sexual contact of a minor (CSCM) statute, NMSA 1978, § 30-9-13(B)(2)(a), (C)(2)(a) (2003). The criminal code defines "position of authority" as "that position occupied by a parent, relative, household member, teacher, employer or other person who, by reason of that position, is able to *exercise undue influence over a child*[.]" Section 30-9-10(E) (emphasis added). In relevant part, third-degree CSCM is defined as "all criminal sexual contact of a minor perpetrated . . . on a child thirteen to eighteen years of age when . . . the perpetrator is in a position of authority over the child and *uses that authority to coerce the child* to submit[.]" Section 30-9-13(C)(2)(a). Similarly, second-degree CSCM is defined as "criminal sexual contact . . . with the unclothed intimate parts of a minor[,] perpetrated. . . on a child thirteen to eighteen years of age when . . . the perpetrator is in a position of authority over the child and *uses that authority to coerce the child* to submit[.]" Section 30-9-13(B)(2)(a) (emphasis added). Both statutes, by their plain language, pertain only to criminal conduct perpetrated on children. When "the language of the statute is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation." *State v. McWhorter*, 2005-NMCA-133, ¶ 5, 138 N.M. 580, 124 P.3d 215. Because the plain language of both the position of authority definition statute and the CSCM statute explicitly pertain only to crimes against children, we decline to engage in further statutory interpretation about the possible applicability of these statutes to the CSP of an inmate statute. Moreover, omission of such language in the statute at issue here is consistent with the Legislature's understanding of the "extraordinary power" a corrections officer has over an inmate by his status alone, *Spurlock*, 2016-NMSC-014, ¶¶ 18-19 (internal quotation marks omitted), which makes such language superfluous. *See State v. Marshall*, 2004-NMCA-104, ¶ 8, 136 N.M. 240, 96 P.3d 801 (noting that it is well-settled law that "we do not read language into a statue, especially where [it] makes sense as written").

**{24}**   We are similarly unpersuaded by Defendant's argument asking us to interpret the CSP of an inmate statute based on statutes regarding CSP perpetrated by a psychotherapist on a patient. Defendant relies on the statutory definition of "force or coercion," which includes "the perpetration of criminal sexual penetration or criminal sexual contact by a psychotherapist on his patient, *with or without the patient's consent*,

during the course of psychotherapy or within a period of one year following the termination of psychotherapy." Section 30-9-10(A)(5) (emphasis added). Based on this statute, Defendant argues that when our Legislature intends that a particular relationship between adults negates the possibility of legal consent, "it does so by requiring coercion and then adding that relationship [as an exception] to the definition thereof." Stated differently, Defendant contends that in order to criminalize CSP of an inmate without an element of coercion, our Legislature would have included a coercion requirement for CSP of an inmate and separately exempted the specified relationship from the statutory definition of coercion. To the extent that Defendant invites us to consider this line of reasoning—that the Legislature must include an element of coercion in order to exclude it—we decline to do so. *See Marshall*, 2004-NMCA-104, ¶ 7 (stating that we give "effect to the plain meaning of the words of statute, unless this leads to an absurd or unreasonable result"). Stated more simply, had the Legislature intended to limit applicability of the CSP on an inmate statute in this manner, it could as easily done so as it did in the above-described statutory circumstances. But it did not. *See Chatterjee v. King*, 2011-NMCA-012, ¶ 15, 149 N.M. 625, 253 P.3d 915 (noting that "the Legislature knows how to include language in a statute if it so desires"), *rev'd on other grounds*, 2012-NMSC-019, 280 P.3d 283.

**{25}** Additionally, we are unpersuaded by Defendant's claim that all forms of second-degree CSP require proof of force or coercion because third-degree CSP incudes the element of force or coercion. *See* § 30-9-11(F). First, as the State correctly points out, Defendant's argument is contrary to our Supreme Court's precedent in *Stevens*, which acknowledges that not all second-degree CSP requires a showing of force or coercion. *See* 2014-NMSC-011, ¶ 39 (holding that second-degree CSP based on the commission of a felony is perpetrated either by "force or coercion or against a victim who, by age or other statutory factor, gave no lawful consent"). Second, such an interpretation is contrary to the legislative history of the CSP of an inmate statute, which demonstrates that our Legislature originally considered and rejected language requiring an element of coercion. When introduced, the original proposed language defined CSP of an inmate as:

> [CSP] perpetrated . . . on an inmate confined in a correctional facility under the control of the corrections department when the perpetrator is an employee of the corrections department in a position of authority over the inmate *and uses that authority to coerce the inmate to submit*[.]

H.B. 1004, 42nd Leg., 1st Sess. (N.M. 1995) (emphasis added). This language was amended in relevant part by *removing* the reference to the perpetrator's use of authority to coerce the inmate from the language ultimately enacted by the Legislature. 1995 N.M. Laws, ch. 159, § 1(D)(2). Because our Legislature considered and rejected an element of coercion in the CSP of an inmate statute, we decline to read one into the statute now.

**{26}** Finally, to the extent that Defendant asks us to interpret the elements of CSP of an inmate statute based on the quantum of punishment for the various degrees of CSP,

we decline to do so because such an inquiry is properly within the purview of our Legislature. *See State v. Archibeque*, 1981-NMSC-010, ¶ 5, 95 N.M. 411, 622 P.2d 1031 ("Absent a compelling reason . . . the judiciary should not impose its own views concerning the appropriate punishment for crimes.").

**{27}** Because we hold that as a matter of law, an inmate confined in a correctional facility or jail cannot consent to sexual penetration committed by a perpetrator in a position of authority over the inmate, we conclude that the district court properly denied Defendant's proposed jury instruction defining unlawfulness for CSP of an inmate in terms of an absence of consent.

## II. The District Court Did Not Abuse its Discretion by Admitting Evidence Regarding Defendant's Vasectomy and Denying Defendant's Motion for a Mistrial

**{28}** Defendant argues that "the State failed to articulate a theory of *any* relevance for [Victim A.S.'s] testimony [about Defendant's vasectomy] and its admission was an abuse of discretion for that reason alone" under Rule 11-401 NMRA. Additionally, Defendant contends that the district court erred in denying his motion for a mistral based on Victim A.S.'s reference to "the victim's advocate" present in the courtroom, which Defendant argues implicated [Victim A.S's] status as another victim and was therefore propensity evidence, thus unfairly prejudicial. We address each argument in turn.

**{29}** "We review the admission of evidence under an abuse of discretion standard and will not reverse in the absence of a clear abuse." *State v. Sarracino*, 1998-NMSC-022, ¶ 20, 125 N.M. 511, 964 P.2d 72. Likewise, a motion for a mistrial is addressed to the sound discretion of the district court and will not be disturbed absent a showing of abuse of discretion. *See State v. McDonald*, 1998-NMSC-034, ¶ 26, 126 N.M. 44, 966 P.2d 752; *State v. Fry*, 2006-NMSC-001, ¶ 52, 138 N.M. 700, 126 P.3d 516. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *State v. Rojo*, 1999-NMSC-001, ¶ 41, 126 N.M. 438, 971 P.2d 829 (internal quotation marks and citation omitted).

### A. Relevance of Evidence of Vasectomy

**{30}** We first address the relevance of Victim A.S.'s testimony. Evidence is relevant if it tends "to make a fact more or less probable than it would be without the evidence, and . . . the fact is of consequence in determining the action." Rule 11-401. "Any doubt should be resolved in favor of admissibility." *State v. Stanley*, 2001-NMSC-037, ¶ 6, 131 N.M. 368, 37 P.3d 85. Defendant argues that the State mistakenly conflated evidence of a vasectomy with evidence of circumcision, and only the latter was at issue. The State argues that there was no confusion in the discussion of these two subjects. After reviewing the record, we find no evidence of confusion regarding the difference between

a vasectomy and circumcision. The district court discussed both issues and ultimately ruled to allow only testimony regarding Defendant's statement implying he had a vasectomy. Additionally, evidence of a vasectomy was undoubtedly relevant evidence. The serology report presented at trial identified the presence of semen, but no sperm on Victim N.S.'s underwear, and additional evidence at trial established that a vasectomy is one reason why a semen sample might not contain sperm. Thus, evidence of Defendant's vasectomy was probative of whether it was Defendant's semen on Victim N.S.'s underwear and whether he committed the sexual assault as Victim N.S. described. Therefore, we conclude that it was not an abuse of discretion for the district court to admit Victim A.S.'s testimony for the relevant limited purpose of Defendant's statements implying that he had a vasectomy.

## B.    Defendant's Motion for Mistrial

**{31}**    Next, we address Defendant's claim that Victim A.S.'s statement that she recognized "the victim's advocate" present in the courtroom implicated her status as another alleged victim and was unfairly prejudicial. Even assuming without deciding that Victim A.S.'s statement amounted to a reference to her own status as an alleged victim and implicated that Defendant had committed other wrongs, we conclude that the district court did not err by denying Defendant's motion for a mistrial.

**{32}**    Discussion of erroneous admission of prior crimes or bad acts, and whether an admonition can cure the prejudice, turns in part on whether the reference was inadvertent or deliberately elicited. *See State v. Gonzales*, 2000-NMSC-028, ¶¶ 35-42, 129 N.M. 556, 11 P.3d 131, *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, ¶ 37 n.6, 275 P.3d 110. For "inadvertent remarks made by a witness about a defendant's inadmissible prior crime or wrong[,] . . . the trial court's offer to give a curative instruction, even if refused by the defendant, is sufficient to cure any prejudicial effect." *Fry*, 2006-NMSC-001, ¶ 53 (internal quotation marks and citation omitted). "The overwhelming New Mexico case law states that the prompt sustaining of the objection and an admonition to disregard the answer cures any prejudicial effect of inadmissible testimony." *Gonzales*, 2000-NMSC-028, ¶ 37 (internal quotation marks and citation omitted).

**{33}**    To the extent that we understand Defendant to argue that the State "recklessly" asked Victim A.S. an open-ended question, and that such recklessness amounts to intentionally solicited testimony, we disagree. During discussions with the district court regarding the proposed scope of Victim A.S.'s testimony, the State described the limited nature of the questions, which began with "who [Victim A.S.] is, does she recognize anyone in the courtroom, [and] what's he wearing[.]" Immediately after Victim A.S. testified that she recognized the victim's advocate, Defense counsel asked to approach for a bench conference, in which he moved for a mistrial. When Victim A.S. resumed her testimony, the State began by clarifying, "I realize that you recognize many people from witness interviews with the attorney general's office and that sort of thing. Do you recognize anyone else from prior to that?" Victim A.S. then identified Defendant and described what he was wearing. Based on the context of the discussions with the

district court, the State's proposed sequence of questions, and the testimony ultimately elicited, we conclude that the State did not intend for Victim A.S. to identify the victim's advocate in the courtroom but rather to identify the Defendant as someone she knew.

**{34}**  The district court acknowledged that although the parties were aware of the pending case in which Victim A.S. was an alleged victim of Defendant, there was "no indication to this jury that this witness was another alleged victim [or] an inmate, nothing of that nature." The district court offered a curative instruction, which Defendant declined. Even assuming without deciding that the unintentionally solicited reference to the victim's advocate amounted to a reference to another wrong committed by Defendant, the district court's offer to give a curative instruction was sufficient to cure any prejudicial effect. *See Fry*, 2006-NMSC-001, ¶ 53 (holding that the offer of a curative instruction, even if refused, is sufficient to cure any prejudicial effect of an inadvertent remark about an inadmissible prior crime). Because the testimony was unintentionally solicited, and because the district court offered a curative instruction, we conclude any prejudicial effect of the remark was cured and therefore the district court did not err by denying Defendant's motion for a mistrial.

**Defendant's Trial for Assault Against Victim F.S.**

**BACKGROUND**

**{35}**  The following was presented at Defendant's trial for assault against Victim F.S. On March 10, 2015, Victim F.S. was an inmate in county jail, incarcerated for a probation violation. Victim F.S. appeared in court that day for her hearing and was sentenced to the Community Corrections Program, wherein a supervisor, or "tracker," would monitor her while in the program. While at the courthouse, she wore an orange inmate uniform and remained shackled in the four-point manner described earlier. Victim F.S. was aware that inmates could "get maced or in trouble," if they refused to comply with a guard's orders.

**{36}**  Defendant, a uniformed corrections officer responsible for Victim F.S.'s transport, escorted her out of the courtroom after her hearing. Defendant took Victim F.S. to the courthouse basement in an elevator inaccessible to the public; as she was about to enter the basement holding cell, Defendant stopped Victim F.S. and told her to get back into the same elevator and escorted her to another floor of the courthouse, which he said was not in use that day. To reiterate, male corrections officers are prohibited from being alone with female inmates.

**{37}**  Once outside the elevator, Defendant told Victim F.S. that he thought they should go out dancing and drinking together, and attempted to kiss her. Still shackled, Victim F.S. pushed Defendant backward and backed away from him. After this first attempt to kiss Victim F.S., Defendant "kept insisting," telling her that he liked her and again asking her to go out dancing and drinking with him. Defendant then attempted for a second time to kiss Victim F.S., who again pushed him away from her.

**{38}** Victim F.S. asked Defendant how he knew that no one else was around and told him that if anyone were to walk in, all she would have to do was "start crying;" Defendant then "got in [her] face" and angrily replied, "You would fucking do that?" Victim F.S. told Defendant that things did not "have to go down like this" because she would give him her phone number and they could "get down" that same day. She then gave Defendant her phone number, which Defendant saved to his cell phone. Victim F.S. testified that she gave Defendant her phone number because she was afraid. She also testified that she felt nervous, uncomfortable, and scared that Defendant would try to do more than kiss her.

**{39}** Victim F.S. was released late that same night, at which time she had already received messages on her cell phone from Defendant, and throughout the next week Defendant continued to call her. Approximately one week after his attempts to kiss her, Defendant left a voicemail message for Victim F.S. in which he threatened to call her "tracker" if she continued to refuse to return his calls, which she interpreted as a threat to send her back to jail.

**{40}** At trial, Defendant presented no evidence and argued that although his behavior was inappropriate, his intent was "amorous," and the incident was merely a "failed courtship" based on mixed signals. Defendant also argued that that the "best evidence" of this courtship was that Victim F.S. gave Defendant her actual cell phone number.

**{41}** The jury convicted Defendant of two counts of assault.

## DISCUSSION

### I. The District Court Did Not Abuse Its Discretion by Admitting Evidence of Defendant's Voicemail Message

**{42}** Defendant contends that the district court erred by admitting evidence of the voicemail message he left for Victim F.S. In the message, Defendant threatened to call Victim F.S.'s "tracker" if she continued to refuse to return his calls, which she interpreted to as a threat to send her back to jail. Defendant argues that the district court erred by allowing testimony about the message because (1) the message was left a week after the incident with Victim F.S. and was therefore irrelevant, and (2) the testimony was unfairly prejudicial propensity evidence. The State argues that testimony regarding Defendant's threat of penal consequences for Victim F.S.'s refusal to answer his calls was relevant to support Victim F.S.'s testimony that she only gave Defendant her real phone number out of fear.

**{43}** Relevant evidence tends to make a fact of consequence "more or less probable than it would be without the evidence[.]" Rule 11-401(A). Here, the jury was presented with two theories of the underlying events. Victim F.S. testified that Defendant's advances were unwanted and that she only gave Defendant her cell phone number out of fear. In contrast, Defendant argued that the incident was a failed courtship based on mixed signals, and that the "best evidence" of this courtship was that Victim F.S. gave

Defendant her real phone number. Whether their interaction represented an attempted courtship or an attempted battery was the central question for the jury to answer, and we cannot say that it was "against the logic and effect of the facts and circumstances of the case[,]" *Rojo*, 1999-NMSC-001, ¶ 41 (internal quotation marks and citation omitted), for the district court to allow testimony about Defendant's voicemail message threatening Victim F.S. with penal consequences if she continued to refuse his calls.

**{44}** Regarding Defendant's argument that the voicemail message amounted to unfairly prejudicial propensity evidence, we note that the argument is unpreserved. "In order to preserve an issue for appeal, a defendant must make a timely objection that specifically apprises the trial court of the nature of the claimed error and invokes an intelligent ruling thereon." *State v. Montoya*, 2015-NMSC-010, ¶ 45, 345 P.3d 1056 (internal quotation marks and citation omitted). At trial, Defendant objected to testimony about the voicemail only on relevance grounds, arguing to the district court that the testimony concerned a period of time after the incident. After clarifying that the message was left approximately one week after the incident, the district court overruled Defendant's objection. Because Defendant failed to alert the district court to issues regarding unfair prejudice or propensity, thereby failing to invoke a ruling on this issue, the argument is unpreserved, and we decline to address it further. *See* Rule 12-321(A) NMRA ("To preserve an issue for review, it must appear that a ruling or decision by the [district] court was fairly invoked.").

**{45}** For these reasons, we hold that the district court did not abuse its discretion by admitting testimony regarding Defendant's voicemail message threatening Victim F.S. approximately one week after assaulting her.

## II. Sufficient Evidence Supports Defendant's Assault Convictions

**{46}** Defendant contends that neither of his two convictions of assault are supported by sufficient evidence. Specifically, Defendant focuses on the sequence of events and claims that his angry statements to Victim F.S. occurred *after* both of his attempts to kiss her, arguing that there was no evidence that Defendant was angry at the time of either of his attempts to kiss Victim F.S. The State counters that sufficient evidence supports Defendant's convictions because the element on which Defendant focuses was not limited to only a finding of anger, but rather required a finding that the attempt to kiss Victim F.S. was done in a rude, angry, or insolent manner, and sufficient evidence supports a jury finding that Defendant's conduct met the "rude" or "insolent" alternatives.

**{47}** "Whether there is sufficient evidence to support a conviction is a question of law which we review de novo." *State v. Neal*, 2008-NMCA-008, ¶ 20, 143 N.M. 341, 176 P.3d 330. "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *Montoya*, 2015-NMSC-010, ¶ 52 (internal quotation marks and citation omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion[.]" *State v. Salgado*, 1999-NMSC-008, ¶ 25, 126 N.M. 691, 974 P.2d 661 (internal quotation marks and citation omitted), *overruled on other grounds by State v. Martinez*, 2021-NMSC-002, 478 P.3d 880. We "view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. We measure the sufficiency of the evidence against the jury instructions given, which become the law of the case. *State v. Jackson*, 2018-NMCA-066, ¶ 22, 429 P.3d 674.

**{48}** The jury found Defendant guilty of two counts of assault after being instructed in pertinent part, that in order to find Defendant guilty of assault, the State must prove beyond a reasonable doubt each of the following elements:

1.  [D]efendant intended to commit the crime of battery against [Victim F.S.] by trying to kiss her;

    A battery consists of intentionally touching or applying force in a rude, insolent, or angry manner.

2.  [D]efendant began to do an act which constituted a substantial part of the battery but failed to commit the battery;

3.  This happened in New Mexico on or about the 10th day of March, 2015.

Identical instructions were used for each of the two counts of assault, which were based on Defendant's two attempts to kiss Victim F.S. Our Supreme Court has described "rude" as "offensive in manner or action"; "insolent" as "insult[ing], contemptuous, or brutal in behavior"; and "angry" as "various forms of displeasure". *State v. Nozie*, 2009-NMSC-018, ¶ 40, 146 N.M. 142, 207 P.3d 1119 (internal quotation marks and citation omitted); s*ee State v. Johnson*, 2009-NMSC-049, ¶ 10, 147 N.M. 177, 218 P.3d 863 ("When a term is not defined in a statute, we must construe it, giving those words their ordinary meaning absent clear and express legislative intention to the contrary." (internal quotation marks and citation omitted)).

**{49}** Although the State primarily focused in closing arguments on Defendant's angry statements made to Victim F.S. after his second attempt to kiss her, the State also asked the jury to consider the surrounding circumstances of the incident. Specifically, that Defendant was a corrections officer, that Victim F.S. was an inmate under his control, and that Victim F.S. was shackled and afraid. The State also highlighted evidence that inmates "can get maced or in trouble," if they refuse to comply with a guard's orders. Defendant conceded that the behavior was inappropriate for the workplace, but argued that his intent was amorous, not rude, insolent, or angry. Nevertheless, the jury was free to reject Defendant's version of events, *see State v. Salazar*, 1997-NMSC-044, ¶ 46, 123 N.M. 778, 945 P.2d 996, and apparently did so by finding Defendant guilty of both counts of assault.

**{50}** Even assuming without deciding that Defendant's angry statements, made immediately after his second attempt to kiss Victim F.S., could not provide evidence of

the manner in which he attempted to kiss her, we conclude that sufficient evidence supports Defendant's convictions for assault. Victim F.S. was under Defendant's physical control, restrained by shackles, and isolated within the courthouse when Defendant attempted to kiss her. Her testimony provided relevant direct and circumstantial evidence from which a reasonable jury could conclude that under these specific circumstances, Defendant's attempts to kiss her were done in an offensive or insulting manner. *See Nozie*, 2009-NMSC-018, ¶ 40 (defining "rude" as "offensive in manner or action" and "insolent" as "insult[ing]"). Indulging all reasonable inferences and viewing the evidence in the light most favorable to the verdict, we conclude that sufficient evidence supports Defendant's convictions for assault.

### III.      Defendant's Multiple Assault Convictions Do Not Violate Double Jeopardy

**{51}**      Lastly, Defendant argues that his multiple assault convictions violate double jeopardy because his two attempts to kiss Victim F.S. amount to a single, unitary course of conduct. The State argues that Defendant's multiple convictions are sufficiently distinct because after Defendant committed his first attempted battery, he was informed that his advances were unwelcome and tried again to commit another battery.

**{52}**      "A double jeopardy claim is a question of law that we review de novo." *State v. Bernal*, 2006-NMSC-050, ¶ 6, 140 N.M 644, 146 P.3d 289. "The constitution protects against both successive prosecutions and multiple punishments for the same offense." *State v. Branch*, 2018-NMCA-031, ¶ 22, 417 P.3d 1141; *see* U.S. Const. amend. V; N.M. Const. art. II, § 15. Defendant raises a unit-of-prosecution claim "in which an individual is convicted of multiple violations of the same criminal statute." *Bernal*, 2006-NMSC-050, ¶ 7. "The relevant inquiry in a unit of prosecution case is whether the Legislature intended punishment for the entire course of conduct or for each discrete act." *State v. Bernard*, 2015-NMCA-089, ¶ 17, 355 P.3d 831 (alterations, internal quotation marks, and citation omitted). To determine our Legislature's intended unit of prosecution, we use "a two-part test, both parts of which are concerned with legislative intent." *State v. Swick*, 2012-NMSC-018, ¶ 33, 279 P.3d 747. "First, courts must analyze the statute at issue to determine whether the Legislature has defined the unit of prosecution." *Id.* We do this by examining the statute's "wording, history, purpose, and the quantum of punishment that is prescribed[.]" *Id.* "If the unit of prosecution is clear from the language of the statute, the inquiry is complete." *Id.* "However, if the language is ambiguous, we proceed to the second step of the analysis in which our task is to determine whether a defendant's acts are separated by sufficient indicia of distinctness to justify multiple punishments under the same statute." *Bernard*, 2015-NMCA-089, ¶ 17 (internal quotation marks and citation omitted). In determining distinctness, we consider the six *Herron* factors: (1) time between criminal acts, (2) location of the victim during each act, (3) existence of any intervening events, (4) distinctions in the manner of committing the acts, (5) the defendant's intent, and (6) the number of victims. *Herron v. State*, 1991-NMSC-012, ¶ 15, 111 N.M. 357, 805 P.2d 624. If there is no distinctness to the acts charged, then the rule of lenity applies, meaning "doubt will be resolved against turning a single transaction into multiple offenses." *State v. Olsson*, 2014-NMSC-012, ¶ 18, 324 P.3d 1230 (internal quotation marks and citation omitted).

**{53}** Defendant was convicted of assault for attempted battery. In relevant part, "assault" is defined as "an attempt to commit a battery upon the person of another[,]" § 30-3-1(A), and "battery" in turn is defined as "the unlawful, intentional touching or application of force to the person of another, when done in a rude, insolent or angry manner." Section 30-3-4. Without a clear unit of prosecution defined in the statute, we apply the *Herron* factors to determine if the two attempts to kiss Victim F.S. were sufficiently distinct to support Defendant's multiple convictions.

**{54}** We first discuss the four factors that weigh in favor of treating the two attempts to kiss Victim F.S. as unitary conduct rather than distinct acts. First, very little time passed between Defendant's two attempts to kiss Victim F.S. The evidence presented at trial did not specify the amount of time between the two acts, but Victim F.S. testified that after Defendant's first attempt to kiss her, she pushed him back, backed up, and Defendant then "kept insisting," telling Victim F.S. that he liked her and asking her to go out dancing and drinking. We note that this Court has previously "emphasize[d] that the time between each act is not dispositive. . . . The proximity in time between criminal acts merely indicates that the greater the interval between acts, the greater the likelihood of separate offenses." *State v. Handa*, 1995-NMCA-042, ¶ 26 n.2, 120 N.M. 38, 897 P.2d 225 (alteration, emphasis, internal quotation marks, and citation omitted). Second, both acts were committed in the same general courthouse location. Third, both attempts to kiss Victim F.S. were conducted in a similar manner; each time, Defendant asked Victim F.S. to go dancing and drinking and then attempted to kiss her while she was shackled and incarcerated under his supervision. Fourth, both acts were committed against the same victim.

**{55}** However, the remaining two factors weigh in favor of treating the two attempts to kiss Victim F.S. as distinct acts—namely, the intervening events between the two acts and the changes to Defendant's intent. After Defendant's first attempt to kiss her, Victim F.S. managed to physically rebuff Defendant by pushing him backward and backing away from him, despite being shackled at the time. Victim's physical blocking and distancing herself from Defendant, along with the conversation that followed, constitute intervening events between the two criminal acts. These intervening events also demonstrate a change in Defendant's intent from the first assault to the second. The first attempt to kiss Victim F.S. was, as Defendant conceded, inappropriate behavior for a corrections officer; however, Defendant did not yet have specific knowledge that Victim F.S. did not consent to being kissed. In addition to the many factors that made Defendant's behavior inappropriate in the first assault, when Defendant committed the second assault, he did so in the face of Victim F.S.'s specific lack of consent.

**{56}** To the extent that Defendant argues, based on *Handa*, that there was insufficient time between acts to constitute intervening events, we disagree. *Handa* involved "little, if any, time" in between multiple gunshots fired by the defendant at a single victim, with merely a "pause[]" between the gunshots. *Id.* ¶¶ 22, 26. In contrast to *Handa*, we need not speculate about what happened between the two criminal acts because Victim F.S. testified to the nature and sequence of the intervening events, and established that they were of greater significance than a mere pause between gunshots.

**{57}** On balance, because of the intervening events between the two assaults, and because of Defendant's changing intent from the first to the second assault, we hold that Defendant's two assault convictions are based on sufficiently distinct acts and therefore do not violate double jeopardy. *See State v. Carson*, 2020-NMCA-015, ¶ 41, 460 P.3d 54, *cert. denied*, 2020-NMCERT-___ (No. S-1-SC-38128, Feb. 6, 2020) (applying the *Herron* factors and concluding that intervening events alone, without a change to the defendant's intent, were insufficient to support multiple convictions for violations of the same statute against the same victim).

**CONCLUSION**

**{58}** For the foregoing reasons, we affirm.

**{59}   IT IS SO ORDERED.**

**KRISTINA BOGARDUS, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Chief Judge**

**SHAMMARA H. HENDERSON, Judge**